The Investigation
Lieutenant Nicholas Gernon[7] (hereinafter "Lt. Gernon") and Detective Bruce Brueggeman (hereinafter "Det. Brueggeman") handled the investigation. Neither gun was recovered but ballistics tests of the casings collected after the shooting indicated that one gun was a nine-millimeter and the other was a forty-caliber Smith and Wesson. The location where the four nine-millimeter casings were recovered established that the defendant shot a nine-millimeter gun. Ms. Thomas was killed by a bullet fired from the forty-caliber gun.
As the case developed, the NOPD canvassed the area to obtain video surveillance from surrounding businesses which captured the moments leading up to the incident and its aftermath.[8] Police located video from the 400, 500 and 700 blocks of Bourbon Street which depicted the unknown male making his way towards the group. Det. Brueggeman was tasked with locating the shooter in the red t-shirt and developed the defendant as a suspect through those videos and social media. The Louisiana State Police were tasked with locating the unknown male shooter in chef pants, but were ultimately unsuccessful. While numerous victims were questioned, none were able to identify either shooter. As a result of the investigation, both Odom and the defendant were sought by police.
Shortly after the shooting, NOPD questioned Benvenuti, who was hit by four bullets in the back of his leg, foot and buttock. Benvenuti, a longtime friend of the defendant, was initially uncooperative in the investigation. Benvenuti identified Parent, Cooper and Kelley as the group he was with that night, but failed to identify Odom or the defendant.[9] He did not indicate he witnessed the shooting or saw the defendant shoot in self-defense.
On July 2, 2014, Odom turned himself in with his attorney present at the Gretna Police Station. Odom completed an eyewitness *648 identification form where he failed to identify the defendant, who was pictured in the six person line-up. In that statement, he actively misled the police by indicating that two others pictured in the line-up had similar qualities to the shooter, such as a similar nose or skin complexion. He maintained that he did not know the defendant and did not inform investigators that the shooting was in self-defense.
The defendant was ultimately arrested on July 4, 2014 in Mississippi. While still in custody in Mississippi, the defendant made no statements to police, invoking his right to counsel. As the investigators were leaving the room, he insisted that the police had the wrong person. He fought extradition, but was ultimately returned to Louisiana, where he was indicted on August 22, 2014.
PROCEDURAL HISTORY
On August 22, 2014, the defendant was indicted by a grand jury charging him with one count of manslaughter, a violation of La. R.S. 14:31, relative to the death of Ms. Thomas (Count 1) and one count of attempted second degree murder, a violation of La. R.S. 14:(27)30.1, relative to shooting at the unknown male, (Count 2).[10] On August 27, 2014, the defendant pled not guilty to both charges.
The case proceeded to trial on January 11, 2016, concluding on January 15, 2016.[11] After the jury retired for deliberation, the defendant moved for a mistrial, based upon the State's closing and rebuttal argument, including misstatements of fact and law, which the trial court denied. The jury *649 returned a verdict of guilty as charged of manslaughter on Count 1 and guilty of attempted manslaughter on Count 2.[12] On April 1, 2016, the defendant filed a motion for new trial, which was denied. On April 4, 2016, the defendant was sentenced to forty years imprisonment at hard labor on Count 1 and twenty years imprisonment at hard labor on Count 2, with the sentences to run consecutively. This appeal followed.
ERROR PATENT
A review of the record reveals no errors patent under La C.Cr.P. art. 920.
DISCUSSION
Assignment of Error No. 1:
In his first assignment of error, the defendant attacks the sufficiency of the evidence in two respects. First, he argues that there is insufficient evidence to support his conviction for attempted manslaughter because the State failed to disprove that he shot the unknown male in self-defense or in defense of others. Second, he contends there is insufficient evidence to support his conviction for the manslaughter because the unknown male fired the fatal shot that killed Ms. Thomas.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court must determine that the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt."[13] The statutory test of La. R.S. 15:438"works with the Jackson constitutional sufficiency test to evaluate whether all the evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury."[14]
Attempted Manslaughter
The State charged the defendant with attempted second degree murder under La. R.S. 14:(27)30.1.[15] The jury found the defendant guilty of attempted manslaughter, which is a responsive verdict to attempted second degree murder.[16] Whenever there is an attempt to commit any crime it is a specific intent crime.[17] The defendant admits that he fired his gun four times at the unknown male, arguing only that he cannot be convicted for his actions because he fired in self-defense and/or defense of his friends and that his actions were thus legally justified.[18]
"This court has consistently declined to settle definitively the issue of which party bears the burden of persuasion in proving self-defense in a non-homicide case."[19] While some cases suggest that the defendant must prove by a preponderance of the evidence that he acted in self-defense, others indicate the State has to establish beyond *650 a reasonable doubt that the defendant did not act in self-defense.[20] We need not resolve this issue here because we find that under either standard, the evidence is sufficient to support a finding that the defendant did not act in self-defense.[21]
In a non-homicide matter, a justification defense mandates a two-step review, specifically: (1) a subjective inquiry into whether the force was apparently necessary and (2) an objective inquiry into whether the force used was reasonable under the circumstances.[22] Furthermore, "[t]he trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the fact finder's discretion 'only to the extent necessary to guarantee the fundamental protection of due process of law.' "[23]
On appeal, the defendant argues that the State failed to prove that he did not act in self-defense or defense of others. Specifically, the defendant contends the State failed to show that he, Odom and Benvenuti DID NOT: (1) reasonably believe they were in imminent danger of death or receiving great bodily harm and (2) reasonably believe that the use of force was a necessary response. The defendant contends that there was no conflicting testimony from the only two eye-witnesses, Benvenuti[24] and Odom,[25] that: (1) their *651 group did nothing to provoke the attack; (2) that the unknown male pulled a gun first, announced "I got that .40." and was the aggressor (arguing the words of the unknown male, coupled with the unknown male pointing a gun at the group, prompted appropriate defensive action);[26] (3) the defendant and his friends were in reasonable fear for their lives; and (4) the defendant had no choice but to act. Since he argues there was no evidence to suggest that he was the aggressor, the trial court improperly granted a jury instruction on the aggressor doctrine, thereby confusing the jury. Finally, the defendant argues that he fled the scene initially because the unknown male was still firing and then fled to Mississippi to obtain money for legal counsel.
Testimony presented in the light most favorable to the prosecution established that Odom was the initial aggressor, surrounded by a large group of friends, when he instigated a confrontation with a lone unknown male, whom he claimed to have never seen before.[27] Odom testified that he shoved the unknown male prior to seeing any gun. The jury heard the testimony and evidence presented at trial and rejected the idea that the defendant's decision to fire at the unknown male was objectively reasonable, in light of the fact that the incident occurred on a crowded street, with many innocent bystanders. Further, the jury apparently determined that the use of a gun, to allegedly subdue the unknown male, was not apparently necessary to prevent an assault or offense. In addition, uncontroverted evidence presented at trial demonstrated that the defendant's claims of self-defense were not immediately disclosed to police.
The defendant and Odom fled to Mississippi on June 30, 2014.[28] Odom testified they did not flee because of any guilt but ostensibly to obtain money for legal counsel. However, in his appellate brief, the defendant acknowledged he did not obtain an attorney until after he returned to Louisiana. While Odom turned himself in at the Grenta Police Station with his counsel present on July 2, 2014, the defendant remained at large. On July 4, 2014, a warrant was issued in Louisiana for the defendant's arrest. On the same day, officers developed information that the defendant was still in Mississippi, obtained a search warrant for that residence, and thereafter apprehended the defendant. His iPhone was retrieved when he was arrested. On July 12, 2014, the defendant was extradited *652 to Louisiana. Once his iPhone was searched on December 30, 2014, investigators found the defendant made two prayers for forgiveness for his sins in two separate notepad entries on July 3, 2014. Specifically, the iPhone contained an admission that he should burn in hell, and another prayer for mercy and forgiveness.
After a review of the evidence before this Court, we find that the jury "made reasonable credibility determinations in favor of the State"[29] and rationally rejected the alternative scenario presented by the defendant's friends, Odom and Benvenuti.[30] Even assuming the burden of disproving beyond a reasonable doubt that the defendant acted in defense of self or others was on the State, a rational juror could have concluded that the evidence was sufficient to find the State carried their burden. i.e., the use of force by the defendant was not necessary.
This Court finds, when "[v]iewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that [the defendant] did not shoot the victim in self-defense."[31] This Court has long recognized that "[f]light and attempt to avoid apprehension indicates consciousness of guilt, and therefore, is one of the circumstances from which a juror may infer guilt."[32] The jury could have reasonably concluded that the defendant fled due to his guilt despite the alternate reasons Odom provided at trial. This assignment of error has no merit.
MANSLAUGHTER
The charge of manslaughter in this case[33] was based upon La. R.S. 14:31(2)(a), which provides that manslaughter is "[a] homicide[34] committed, without any intent to cause death or great bodily harm ... [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or any intentional misdemeanor directly affecting the person."[35] Thus, "[t]he Louisiana legislature has defined felony manslaughter as a *653 homicide committed without intent '[w]hen the offender is engaged in the perpetration or attempted perpetration of [an unenumerated] felony.' "[36]
Louisiana jurisprudence has long held that because "penal statutes must be strictly construed and cannot be extended to cases not included within the clear import of [statutory] language "the legislative intent in employing the word 'offender' contemplated the actual killer."[37]
In Garner, Robert Garner engaged in an altercation with a bartender, James Robinson, in a saloon.[38] Defendant Garner left, but later returned with a knife and attempted to kill bartender Robinson.[39] In self-defense, Robinson pulled a gun, firing at Garner but instead shot and killed George Carson, an innocent bystander.[40] Garner was charged with the attempted murder of Robinson and the manslaughter of Carson. Garner moved to quash the bill of indictment as to the manslaughter charge, noting it was Robinson who shot and killed Carson.[41] The trial court granted the motion to quash, which was ultimately affirmed by the Louisiana Supreme Court. Thus, the Garner decision strictly construed the felony manslaughter statute that employed the term "offender" as meaning that a defendant or an accomplice must perform the direct act of killing. That Garner remains valid jurisprudential authority is indisputable. It has been cited repeatedly by the Louisiana Supreme Court to reiterate specifically that in this state, the felony murder rule requires that "a direct act of the defendant or his accomplice caused the death of the victim."[42] Thus, under Garner , when A shoots at B and B returns fire, killing C, A cannot be found guilty of the murder or manslaughter of C.[43] This jurisprudential theory is referred to as the agency test.
This Court must determine whether the evidence, viewed in the light most favorable to the State, "was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt."[44] Specifically keeping in mind, that in Louisiana, with a case such as this, when A shoots at B and B returns fire, killing C, A cannot be found guilty of a homicide against C because the act resulting in the homicide was neither actually or constructively the act of A.[45]
Under Louisiana law and jurisprudence, the defendant's manslaughter conviction for the death of Ms. Thomas cannot be upheld because he did not physically kill her and was not acting in concert with her actual killer, the unknown male. It is undisputed in this matter that the unknown male fired the fatal shot that killed Ms. Thomas. The factual situation in this *654 case, as the State presented it to the jury, is that the defendant shot at the unknown male who returned fire, shooting and killing Ms. Thomas, similar to the factual situation presented in Garner.[46] Because Garner is indistinguishable from the instant case, we find that the defendant's argument that there is a lack of sufficient evidence to support his conviction for manslaughter has merit.
While this Court finds the evidence is insufficient to support a conviction of manslaughter, that finding does not end our review. When a Louisiana court reverses a conviction for insufficiency of the evidence, it has the authority to review the record and enter a conviction for a lesser-included offense when such conviction is supported by the record.[47] Along with the authority to do so, it can be reasoned that this Court additionally has a duty to enter a conviction for the lesser included offense in such circumstances.[48] Under Louisiana law the verdicts responsive to a charge of manslaughter are as follows: guilty, guilty of negligent homicide, not guilty.[49] Accordingly, we consider whether there is sufficient evidence to support a verdict of negligent homicide.
Negligent homicide is a lesser included offense to the charge of manslaughter and is defined as "the killing of a human being by criminal negligence."[50] "Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring the accused intend some consequence of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions."[51] The mental state requirement for criminal negligence "exists when, ... there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."[52]
*655 In State v. Parker , testimony established that the defendant had been subjected to harassment and was likely fearful at the time he shot and killed the victim.[53] However, evidence also established that the defendant fired at an unknown individual, through a closed door, knowing that several members of the household were expected to return that day.[54] The defendant in Parker was found guilty of negligent homicide, as "[a] rational trier of fact could find that, although the defendant was confronted with a frightening experience, he nevertheless responded in a manner grossly out of proportion to the danger he faced."[55]
Overall, "the common element in negligent homicide cases involving firearms is a finding that a defendant acted in an unreasonably dangerous or unsafe manner at the time of the discharge of his weapon."[56] Thus, this Court must review the record to determine whether the defendant's actions exhibited a "gross disregard for the consequences of his actions."[57] Further, the evidence must support a finding that the defendant's conduct demonstrated a "gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."[58] Testimony at trial, discussed at length above, established that the defendant, while in the midst of a crowd, intentionally fired a gun at an unknown male involved in a confrontation with the defendant and his group of friends.[59] Evidence presented at trial also established that the defendant, prior to firing his gun, was aware the unknown male also possessed a gun. It was therefore reasonably foreseeable that the defendant, in an exchange of gunfire, could injure or kill an innocent bystander, which was the exact result in this case. We find that such action amounted to a "gross deviation below the standard of care" which would be expected of a reasonably prudent person in that situation.[60] Accordingly, we vacate the defendant's conviction and sentence for manslaughter, enter a judgment of conviction of negligent homicide, and remand the matter to the trial court for resentencing on that charge.
OPINION TESTIMONY
Assignment of Error No. 2:
In his second assignment of error, the defendant argues the trial court erred in allowing the opinion testimony of Lt. Gernon and Det. Bruggeman, which usurped the jury's role and constituted a comment on the credibility of other witnesses. The defendant also complains of the State's use of the opinion testimony of Meredith Acosta (hereinafter "Ms. Acosta").[61]
*656 Essentially, the defendant argues the jury convicted him based solely upon this improper opinion testimony, as the only two eye-witnesses contradicted this testimony. Prior to trial, the defendant asserts that Lt. Gernon's testimony was that the video was too distorted to determine what was in the unknown male's hands. This testimony conflicted with his subsequent trial testimony, where he opined that the footage showed the unknown male carrying one beer bottle in his left hand when he walked up to the group and later two beer bottles in his left hand as he fled the scene. The defendant avers that Lt. Gernon's testimony was essentially expert testimony as to what was seen in the video, even though the jurors did not need expert testimony. Additionally, Lt. Gernon was never qualified as an expert. The defendant argues Lt. Gernon was improperly allowed to offer an opinion as to the guilt or innocence of the defendant. The State submits this argument should not be considered by this Court as this issue was not preserved for review. Defense counsel did not lodge contemporaneous objections at trial.
La. C.Cr.P. art. 841(A) provides:
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
Absent a contemporaneous objection at trial, this Court will not consider an assignment of error raised for the first time on appeal.[62] In addition, "a defendant is limited on appeal to those grounds for the objections which he articulates at trial."[63] A review of the trial transcript reveals that defense counsel did not object to any testimony by Lt. Gernon on the grounds first asserted on appeal.[64] The requirement of a contemporaneous objection serves dual purposes, which include:
(1) to put the trial court on notice of the alleged irregularity or error, so that the court can cure the error; and (2) to prevent a party from gambling for a favorable outcome and then appealing on errors that could have been addressed by an objection if the outcome is not as hoped.[65]
A review of the testimony of Det. Bruggeman cited by defendant similarly shows no contemporaneous objection on the grounds asserted on appeal. Considering the lack of contemporaneous objections on the grounds asserted on appeal, this *657 assignment of error was not preserved for review.
The defendant also argues that Ms. Acosta improperly offered opinion testimony. However, both parties stipulated and the trial court qualified her as an expert in firearms, identification and examination. She testified on the State's re-direct that based on the size of a Smith and Wesson forty-caliber gun, she would expect to see the outline of the four inch barrel if it were to be captured on the video. While defense counsel objected to this testimony, the trial court properly sustained the objection, noting she was an expert. Therefore, we find this assignment of error, as to Ms. Acosta, to be without merit.
OTHER CRIMES EVIDENCE
Assignment of Error No. 3:
In his third assignment of error, the defendant argues that his right to a fair trial and due process were violated by the improper introduction of evidence of previous criminal activity, namely: (1) that the gun fired by the defendant was used in a 2012 shooting; (2) evidence through direct testimony of Benvenuti regarding his personal drug use and drug dealing in the time surrounding the shooting; (3) and Odom's alleged "drug deal gone bad" earlier that evening. Specifically, the defendant argues this evidence impugned his character, created guilt by association and prejudice, and was irrelevant to any issue at trial.
As to other crimes evidence of the defendant, specifically evidence that the gun used by the defendant was traced to another crime:
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404B(1); State v. Prieur , 277 So.2d 126, 128 (La. 1973). However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted. State v. Dauzart , 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act. La. C.E. art. 404B(1); Id.[66]
This Court will review the trial court's ruling on admissibility of other crimes evidence under an abuse of discretion standard.[67] "A trial judge, in deciding the issue of relevancy, must determine whether the evidence bears a rational connection to the facts at issue in the case."[68] An abuse of discretion will be found if the prejudicial effect outweighs its probative value.[69] In addition, "erroneous admission of other crimes evidence is subject to a harmless-error analysis."[70] The inquiry, in other words, is not whether, in a trial that occurred *658 without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."[71]
The defendant argues that evidence that the gun he used in this incident was used in an unsolved 2012 shooting was improperly allowed at trial and prejudiced the jury against him.[72] The jury was only told that the nine-millimeter gun used by the defendant was also used in a 2012 shooting, not that the defendant used the gun in that shooting. The State contends that defendant's account of Ms. Acosta's testimony is misleading.
A review of the record before this Court reflects that neither reference to the 2012 match was objected to by the defendant at trial. The defendant's failure to contemporaneously object at trial results in defendant's inability to raise this issue on appeal.[73] Therefore, this assignment of error was not preserved for review.
The defendant also objects to the State's questioning of Benvenuti concerning his drug use just prior to the shooting and drug dealing in the French Quarter. The defendant argues this information prejudiced the jury against him and was irrelevant. The State maintains, in regards to other crimes evidence of Odom and Benvenuti, that issue was likewise not preserved for review on appeal. In addition, the State submits that the evidence regarding both Odom and Benvenuti's prior drug activity supported its theory of the case. Finally, the State contends the prohibition of other crimes evidence only applies to the other crimes of the defendant, not to the crimes of others.[74]
This Court agrees that "the prohibition against other crimes evidence pertains to other crimes by the defendant, not other crimes of someone else."[75] Therefore, we find this assignment of error to be without merit.
The defendant argues the next line of improper and unduly prejudicial questioning pertained to testimony regarding the earlier attempted robbery of Odom's marijuana. It is important to note that on January 8, 2016, the trial court heard the defendant's motion in limine to exclude evidence of the "drug deal gone bad" two hours prior to the defendant's arrival in the French Quarter. At that hearing, the defendant argued that the incident was irrelevant because it occurred before he arrived, would be highly prejudicial, and that the person involved in the earlier robbery was not the same unknown male who shot Ms. Thomas. In response, the State argued that the earlier robbery was relevant for the narrative momentum, was res gestae and necessary to tell the complete story of what happened that night. The trial court agreed with the State, finding that the earlier robbery was part of the State's res gestae and denied the motion in limine.
*659 The State's theory of the case was that the unknown male, who shot and killed Ms. Thomas, was the same person who earlier robbed Odom at gunpoint. As a result of the robbery, Odom called the defendant to come to Bourbon Street armed with a gun. Odom testified that the unknown male involved in the later shooting was someone he never saw before. At trial, Odom described the two unknown men he encountered earlier during the robbery as skinny black males; one was taller, and his hair was pulled back in a rubber band, and the shorter man had dreadlocks. However, the State's theory of the case was that the two incidents were connected and this evidence helped to complete their narrative.
Under Louisiana Code of Evidence Art. 404(B), other crimes evidence is also admissible 'when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.' For other crimes to be admissible under this exception, they must bear such a close relationship with the charged crime that the indictment or information as to the charged crime can fairly be said to have given notice of the other crime as well. State v. Schwartz, 354 So.2d 1332, 1334 (La.1978).
Thus, evidence of other crimes forms part of the res gestae when said crimes are related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. It is evidence which completes the story of the crime by showing the context of the happenings. State v. Brewington, 601 So.2d 656, 657 (La.1992). Evidence of crimes committed in connection with the crime charged does not affect the accused's character because the offenses are committed as parts of a whole. Id. The inquiry to be made is whether the other crime is 'part and parcel' of the crime charged, and is not offered for the purpose of showing that the accused is a person of bad character. State v. Prieur, 277 So.2d 126 (La.1973).
The res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. State v. Huizar, 414 So.2d 741, 751 (La.1982) ; State v. Kimble, 407 So.2d 693, 698 (La.1981).
In addition, as this Court has observed, integral act (res gestae ) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, 'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.' [State v. ]Colomb, supra, 98-2813 at 4 [ (La. 10/1/99) ], 747 So.2d [1074]at 1076 (quoting Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997) ).[76]
At hearings prior to trial, the State presented evidence of the aborted marijuana sale and armed robbery under the theory that the earlier armed robber was the same person as the unknown male who later confronted the group.[77] This Court *660 notes that the State failed to provide testimony in support of this theory at trial. However, the State's theory was supported by the fact that the unknown male walked up to Odom and made an apparent reference to a forty-caliber handgun, stating "I got that .40." and that gun was similar to the one used in the earlier attempted robbery.
The State's theory of the case was that Odom and Benvenuti both sold drugs in the French Quarter. The State theorized as part of their overall case that Odom called the defendant to the French Quarter, armed with a gun, in a direct response to the earlier robbery. Thus, the State argued that evidence was relevant as part of the res gestae -i.e., the continuous chain of events that eventually lead to the deadly shooting. We find this information was relevant to support the State's theory that the shooting was not in self-defense, but related to the previous incident, which occurred only hours before in a "continuous chain of events" and "this testimony was admissible under the res gestae exception." Therefore, we find this assignment of error to be without merit.[78]
RIGHT TO PRESENT A DEFENSE
Assignment of Error No. 4:
In his fourth assignment of error, the defendant argues he was deprived of a fair trial and due process by the trial court's (1) ordering the State to provide an un-redacted police report containing the identity of witnesses five days prior to trial and (2) denying his motion for funds to hire a private investigator to locate witnesses discovered in the un-redacted police report. While the defendant acknowledges that both issues were addressed in pre-trial writs, he argues that the "law of the case" doctrine should not apply.
UN-REDACTED POLICE REPORT
The "law of the case" doctrine was discussed by this Court in State v. Berniard as follows:
This Court explained our application of the law-of-the-case doctrine in State v. Duncan, 11-0563, p. 26 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 521, as follows:
Under the law-of-the-case doctrine, courts of appeal generally refuse to reconsider their own rulings of law on a subsequent appeal in the same case. Pitre v. Louisiana Tech University, 95-1466, p. 7 (La. 5/10/96), 673 So.2d 585, 589. This court has stated that an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. State v. Gillet, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728. The law of the case? [sic] doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. State v. Molineux, 11-0275, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 617, 619.
Our application of the law of the case doctrine is discretionary, and this court will generally not follow the doctrine if the defendant can show that the prior *661 ruling was clearly erroneous or produced an unjust result. [Citations omitted.][79]
In State v. Brown , this Court expounded further on the doctrine in the context of supervisory writs:
The purpose of granting the writ, even though we are denying relief, is because a ruling on the merits does not have precedential value unless the appellate court decides to grant the writ and exercise its supervisory jurisdiction. See Johnson v. Mike Anderson's Seafood, Inc., 13-0379, pp. 5-6 (La.App. 4 Cir. 6/11/14), 144 So.3d 125, 130 ("An appellate court cannot affirm, modify, or reverse a decision by a lower court without granting an application for supervisory review."). See also Toston v. Pardon, 02-0451 (La. 2/13/02), 809 So.2d 973 ("writ grants...with reasons do have precedential effect, and guide trial judges and trial attorneys in future matters") (Calogero, J., dissenting). Conversely, the denial of a writ does not constitute "law of the case" and therefore does not bar subsequent relitigation of the same issue. See State v. Fontenot, 550 So.2d 179 (La.1989) (a denial of supervisory review "does not bar consideration on the merits of the issue denied supervisory review"); State v. Fields, 2013-1493, p. 35, n. 6 (La.App. 4 Cir. 10/8/14), 151 So.3d 756, 778 (law of the case does not apply when appellate court denies a writ); State v. Davis, 09-0438, pp. 12-13 (La.App. 4 Cir. 1/13/10), 30 So.3d 201, 208-09 (same). [Footnote omitted.]
Moreover, we have previously found that the law-of-the-case doctrine is not applicable to a writ denial, even when the denial is accompanied by language purporting to rule on the merits of the issue. See e.g. , State v. Ellis, 13-1401, pp. 24-26 (La.App. 4 Cir. 2/4/15), 161 So.3d 64, 78-80 (court of appeal denied writ, finding "that the trial court did not err in denying the relator's motion to recuse"; on appeal, court considered same issue, finding prior writ denial did not constitute law of the case); Johnson, 13-0379, p. 5, 144 So.3d at 130 (finding that law of the case would not apply to prior writ denials even if the writs had addressed the issue of admissibility of evidence). See also Davis v. Jazz Casino Co., 03-0276 (La. 6/6/03), 849 So.2d 497, 498 (any language in an appellate court's writ denial purporting to rule on the merits of the lower court's actions "is without effect").[80]
The defendant's right to obtain an un-redacted police report was extensively litigated pretrial. In discovery, the defendant was provided with a supplemental report of the police investigation, with some of the witnesses' identities and contact information redacted to protect their safety. The defendant then sought the un-redacted report containing witnesses' names, but the trial court denied the request and the defendant sought supervisory review. In State v. Le , 2015-0014 (La. App. 4 Cir. 4/2/15), 165 So.3d 242, this Court reversed the trial court's denial of the defendant's motion for an un-redacted report and remanded with instructions for the trial court to conduct an ex parte proceeding to be maintained under seal and requiring the State to make a prima facie showing why the un-redacted reports should not be disclosed to the defense. Following the hearing, the trial court again denied the defendant's motion, maintained the redactions to the police report because the State made a sufficient prima facie showing. This Court granted the defendant's *662 writ application seeking review of that ruling, but affirmed the trial court's decision.[81] This Court's grant of the writ but decision to affirm the trial court's judgment indicates a clear intent that the Court's opinion should be considered "law of the case."[82] While the defendant continually sought immediate disclosure of the un-redacted report, the State indicated it would disclose that information immediately prior to trial. Following a status hearing on December 15, 2015 and December 21, 2015, the trial court ordered disclosure of the un-redacted report by January 6, 2016 at 12 p.m. The defendant filed a writ application and a request for a stay with both this Court and the Louisiana Supreme Court, both of which were denied.
Therefore, the inquiry is whether there is anything in the record now before this Court that would merit reconsidering this Court's prior decision affirming the trial court's judgment that the defendant was not entitled receive the un-redacted police report earlier than five days prior to trial.
A review of the record before this Court confirms that the defendant has failed to demonstrate that this Court's prior decision should be reconsidered, as the issues were fully and properly considered.[83] This Court finds that the law of the case doctrine applies to our earlier rulings in this matter, "[t]o the extent that the parties seek in their assignments of error for us to reverse our prior rulings."[84] As the record before us demonstrates, the defendant has failed to show "palpable error or manifest injustice" and thus we find this assignment of error is without merit.[85]
SPECIAL FUNDING
The second argument defendant presents in this assignment of error is that the trial court erred in denying his motion for special funding to hire a private investigator to locate witnesses in the un-redacted police report.
On December 28, 2015, the defendant filed a motion for special funding to help prepare his defense, requesting $50,000 to obtain investigators, private process servers, and to transport witnesses. Attached to that motion were invoices from the defense counsel, along with an affidavit of indigency and poverty signed by the defendant.[86] This request was denied by the trial court.[87] In addition, on January 4, 2016, *663 one week prior to trial, the defendant filed a motion seeking to order the State to subpoena witnesses for trial. He maintained this was necessary as the defendant would not receive the un-redacted report until five days prior to trial. The motion was denied on the same day.[88]
Finally, on January 8, 2015, the defendant filed a request for an expedited hearing to determine his indigency, contending that his financial circumstances had changed since his counsel was hired. In the hearing transcript, the trial court noted that defense counsel previously attached the billing invoices, along with an affidavit of indigency and poverty signed by the defendant, to his motion for special funding. Defense counsel indicated that at the time he was hired, he did not expect that the defendant and his family would be unable to continue to pay the expenses.[89] The trial court denied the defendant's motion.[90] The trial court further noted that "even if the status had changed, I have nothing to review to see if the status has changed."[91]
The defendant submits he was denied a fair trial and the right to present a defense, citing the trial court's denial of his motion to obtain funds to hire an investigator or have the State issue subpoenas. The defendant argues he needed expert assistance in the form of a private investigator to locate and interview the witnesses that were not disclosed until five days prior to trial. Specifically, he notes that investigating and preparing for the late-disclosed witnesses created a large, unbearable financial burden. The defendant alleges he made a threshold showing sufficient to require the State to provide him with funds.
La. R.S. 15:175 (A)(1)(a) provides that "[a] preliminary inquiry and determination of indigency of any accused person shall be made by the court not later than arraignment and such determination may be reviewed by the court at any other stage of the proceedings." "[A] trial court may reassess a determination of indigency at any time, in recognition of the fact that a defendant's financial status may not be static and that a defendant may become indigent at any point in the proceedings."[92] Once a defendant has demonstrated his indigency, even if represented by private counsel, he may seek funds from the State to assist in his defense. State v. Touchet established the showing required to demonstrate a need for additional funds, noting a defendant "must establish that *664 there exists a reasonable probability" that the services of an expert would both be of assistance and that "denial of expert assistance would result in a fundamentally unfair trial."[93] Our Supreme Court explained further:
To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.[94]
The need for funds for an adequate defense may encompass an assortment of different types of assistance, including funds for a private investigator "because furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense."[95]
This Court must consider two issues: (1) whether the trial court erred in failing to determine the defendant was indigent and, if so, (2) whether the defendant was prejudiced by that failure-i.e., whether the trial court's denial of special funding resulted in prejudice to the defendant at trial.
In State v. Frank, supra, it was determined the trial court erred in failing to declare a defendant indigent in order to obtain special funding for psychiatric and mitigation expert assistance for the sentencing phase of her trial .[96] One week prior to trial, the defendant filed a motion to be declared indigent, which the trial court denied after conducting an evidentiary hearing.[97] At the evidentiary hearing, the defendant testified regarding her financial status and the funds available to her to pay for experts. The defendant testified that her mother procured her private attorney, that she owned no real property and her mother sold her furniture in order to pay the attorney's fees along with other bills. Further, as adduced from the record and the indigency hearing: the defendant had no income; the defendant had sold all her furniture to obtain funds which were used to pay existing debts and attorney's fees; had liquidated her retirement benefits which the court had already ordered be paid directly to court reporters; the defendant's mother was disabled; the defendant had no savings at the time of the hearing; and both the defendant and her attorneys submitted affidavits to the court attesting to the fact that she had exhausted all her funds. The Louisiana Supreme Court explained that, even if the defendant once had access to over $11,000, those funds were exhausted, and pursuant to La. R.S. 15:175(A)(1)(a) a determination of Frank's indigency could be made at any point in the proceedings.[98] The Louisiana Supreme Court further determined that that trial court abused its discretion in not declaring the defendant indigent but noted that the inquiry did not end there. Courts must delve further and ask "what, if any, prejudice the defendant suffered as a result of not being declared indigent."[99] The *665 trial court's finding that Frank was not indigent had no bearing on the outcome of her case during the guilt phase, thus there was no prejudice in that respect.[100] However, the Supreme Court concluded the trial court committed error by failing to allow Frank the chance to make a showing under Touchet that she required funding to present mitigating evidence during the penalty phase.[101] The Supreme Court in Frank noted:
By not allowing a hearing on the matter, the trial court did not provide this court with adequate information upon which to review the question of whether the defendant was entitled to the expert assistance she requested for the penalty phase of her trial and what prejudice she may have suffered as a result of not obtaining state-funded assistance.[102]
The case was remanded to the trial court in order to conduct an evidentiary hearing which would allow the defendant the opportunity to make a showing as to whether she was entitled to special funding.[103]
In the case sub judice we must consider the facts in light of Touchet and Frank . The defendant retained very experienced private counsel in August 2014. Two weeks prior to trial, for the first time, the defendant requested an indigency determination. In support of the motion for indigency, defendant attached an affidavit of indgency and an invoice from defense counsel. That affidavit, signed by the defendant, indicates that he was not presently employed, was currently incarcerated and neither his family nor friends had funds to contribute to assist in preparation of his defense and he needed the funds to hire investigators or private process servers for trial. The record before us does contain two paystubs from May 2013 and October 2013, submitted in support of the defendant's earlier bail reduction request. However, the record is void of any additional, current information evidencing his indigency. This Court does note that the defendant was later declared indigent for purposes of appeal.
In the record before this Court regarding the defendant's request for special funding, it does not appear that there was a formal hearing after the motion was filed, but the issue was addressed via a telephone conference. A writ was taken on the denial and this Court ordered the issuance of a per curium on the defendant's motion for special funding. In the per curium , the trial court noted the defendant's claim that he must investigate and subpoena every person identified in and around the crime scene was "preposterous and speculative and will only lead to a fishing expedition at the state's expense to support defendant's claim of self-defense." Further, the trial court specifically observed that "the defendant has been vigorously represented by private counsel since the filing of the August 22, 2014 bill of information. At no time during these proceedings has defendant's access to justice ever been denied, nor has he been denied due process of the law."
Essentially, much like the issue in Frank , the record before this Court does not allow us to properly resolve this assignment of error. The defendant's claims he made a sufficient showing to be declared indigent and that he required special funding to secure witnesses who could have provided favorable testimony would *666 "be more effectively adjudicated in an application for post-conviction relief. The record before this Court is insufficient to allow for an adequate review of these issues."[104] A post-conviction relief application would allow the potential for a full evidentiary hearing to address the deficiencies in the record before us.
PROSECUTORIAL MISCONDUCT
Assignment of Error No. 5:
In the defendant's fifth assignment of error, he alleges he was denied a fair trial and due process because of prosecutorial misconduct at trial. According to the defendant, the following acts constituted prosecutorial misconduct:(1) denying the existence and then delaying production of videos in their possession; (2) misrepresenting the cooperation of the defendant's friends; (3) commenting on the defendant's exercise of his right to remain silent; and (4) the State's closing and rebuttal arguments which (a) attacked defense counsel's statements made to the media which were not in evidence, (b) were not based on the evidence, (c) misstated the evidence and (d) misstated the law.
Disclosure of Evidence
First, the defendant argues that the State's initial non-disclosure and subsequent late disclosure of exculpatory evidence in the form of video footage regarding the incident prevented him from receiving a fair trial. The defendant argues that the State changed its theory multiple times as to what it believed the videos portrayed immediately before and after the shooting. Further, in pre-trial hearings, the defendant's witnesses testified that the NOPD was using this video to influence the witnesses as to what occurred. In response, the State argues that the video evidence, obtained from at least thirty-six cameras in the area, was turned over well in advance of trial, as discussed extensively below.
In addressing discovery violations, the Louisiana Supreme Court has noted:
Even a discovery violation involving the state's failure to disclose exculpatory evidence does not require reversal as a matter of the Due Process Clause "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler[ v. Greene], 527 U.S. [263,]at 281, 119 S.Ct. [1936,]at 1948[ 144 L.Ed.2d 286 (1999) ]. Strickler observes in this regard that while "the term ' Brady violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence .... [t]here are three components of a true Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] claim: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Id., 527 U.S. at 281-82, 119 S.Ct. at 1948.[105]
"[W]hile late disclosure as well as nondisclosure of exculpatory evidence may deprive the defendant of a fair trial, in both instances the impact on the defense 'must be evaluated in the context of the entire record.' "[106] In the case sub judice , the record reflects that the defendant was *667 aware well in advance of trial that surveillance video existed and that defense counsel believed incorrectly that the video showed the unknown male shooter brandishing a firearm before the defendant fired his weapon.
At trial, Lt. Gernon indicated the police continually canvassed the area for surveillance video footage to assist in their investigation. A review of the record demonstrates that at several pre-trial hearings, defense counsel argued there were several witnesses who viewed video footage at the NOPD station which supported the defendant's self-defense or defense of others theory. In fact, at a September 27, 2014 bond reduction hearing, defense counsel called three witnesses, Jasmine Parent, Robert Benvenuti and Christian Cooper, who all testified they had viewed a video depicting the unknown male openly carrying a gun in his hand prior to the shooting. However, at trial, defense counsel stipulated that the NOPD never represented any video existed which depicted the unknown male walking down Bourbon Street brandishing a gun in his hand prior to the shooting.
Late disclosure of favorable evidence to the defendant will require reversal only if it is determined that "it has significantly impacted the defendant's opportunity to present the material effectively in its case and compromised the fundamental fairness of the trial.[107] While the defendant alleges that discovery video was not timely disclosed, and this untimely disclosure prejudiced his case, he fails to support that contention. This Court notes that the defendant further fails to identity the specific videos that were not timely produced and the dates of the complained-about late production. A review of the record demonstrates that the State filed numerous inventories of discovery provided to the defense. Most pertinent to this review is that counsel for the State produced to the defendant a portable media device containing video footage from twenty-five different locations on August 29, 2014. On September 4, 2014, another inventory of discovery reflects the State produced a DVD depicting Canal Street, Bourbon Street and Burgundy, along with a portable media device containing video from four other vantage points, as well as a video of the person of interest. It cannot be said this disclosure can be characterized as late disclosure, based on the record before this Court. There is nothing to show that the defense at trial would have been any different, or that the outcome of the trial was impacted by what occurred in 2014, over a year before trial. Further, both sides used various portions of the video footage repeatedly during the course of the trial. Therefore, we find no merit to this argument.
Cooperation of Defendant's Friends
Next, the defendant argued the State misrepresented his friends' level of cooperation with the investigation at trial to undermine their credibility regarding his self-defense claims. The State refutes the defendant's argument, contending both Odom and Benvenuti were admittedly uncooperative when initially questioned by police.
Benvenuti testified that during his first interview with police he initially lied to them, saying he did not know the defendant and failed to tell them the shooting was in self-defense. Odom testified that he also lied to police and admitted that he failed to cooperate by indicating he could not identify the defendant in order to protect *668 his friend. Thus, based upon Benvenuti and Odom's own trial testimony, both were uncooperative and actively misleading the police during the investigation regarding the defendant's identity. That they may have later become cooperative is not evidence the State misled the defendant about their cooperation prior to trial. Moreover, as their trial testimony clearly demonstrates, Benvenuti and Odom were hostile State witnesses who continued to attempt to exculpate the defendant throughout their testimony. As such, this argument is without merit.
Improper Comments on Defendant's Failure to Testify
Next, the defendant argues that the State improperly commented on his failure to testify at trial. The defendant argues that both exchanges by the State, discussed in detail below, constituted prohibited comments by this State on his failure to testify.
The law is well-settled that '[m]istrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant', and '[t]he determination of whether prejudice has resulted lies within the sound discretion of the trial court.' "[108] La. C.Cr.P. art. 770(3) provides that a mistrial should be granted upon motion of a defendant if the State refers directly or indirectly to the defendant's right to remain silent.
The first complained of exchange occurred at trial on January 14, 2016 during the defendant's cross-examination of Det. Brueggeman as to what happened when the defendant asked for an attorney while in custody in Mississippi. Testimony by Det. Brueggeman established he left the station as soon as the defendant asked for counsel, even though he was aware an attorney for the defendant was present in the parking lot. The following exchange then transpired at trial:
THE DEFENDANT:
Okay. You see, if he talked to the lawyer and wanted to tell you what happened, you weren't around to take a statement. You didn't want to hear from him, did you? You didn't.
THE STATE:
Objection, Your Honor.
THE COURT:
Sustained.
THE STATE:
He could have given a statement at any time.
THE COURT:
Sustained.
The defense continued his questioning, the pertinent exchange being as follows:
THE DEFENDANT:
Didn't you think at this point that it just might be important at this point, to let him talk to the lawyers, so he could tell you what happened? And maybe wait around the next three or four minutes.
DET. BRUEGGEMAN:
No. The suspect had just called me a M***er F***er, three times. No, I didn't think I was going to get anything from him.
The defense continued, questioning why Det. Brueggeman did not immediately get an attorney for the defendant, so that the defendant could potentially answer questions.
THE DEFENDANT:
*669 So you decided when there is a lawyer there, that might help this kid make a statement about what happened out on Bourbon Street, you got-who did you get a call with, and Le at the police station?
THE STATE:
Objection, relevance.
THE COURT:
Sustained.
THE DEFENDANT:
I find there is no penalty of convictions [sic], correct?
THE STATE:
Objection, Your Honor.
THE COURT:
Sustained.
THE STATE:
His client was asked to testify for that information being-THE COURT:
Sustained. Sustained. He doesn't have to testify, counsel. Sustain. Move forward.
THE DEFENDANT:
We need to have a hearing on that.
THE COURT:
No. No. we'll do that later. Please, move on. I note your objection for the record. Move on, counsel. Please.
The other instances of which the defendant complains occurred during the State's rebuttal argument.[109] The State begins by stating that "there has been not one ounce of testimony that tells us Trung Le was in fear or apprehension, not one." The State continued, indicating that the testimony at trial by Odom and Benvenuti was that neither of them spoke with the defendant after the shooting to discuss it and this testimony was a lie. The State continued, arguing that there was "not one ounce of evidence that was presented to know what Trung Le thought or was in fear of-." Defense counsel objected, asking for a sua sponte ruling. The trial court responded, noting "closing arguments, the attorneys are permitted to present for their consideration their contentions regarding what the evidence has shown or not shown and what conclusions they think may be drawn from that." The State continued, "you have no evidence to consider on the self-defense of Trung Le, nothing. Not one-not one person." The trial court corrected the State, advising them that they were "burden shifting." The State continued, arguing that none of the witnesses at trial testified that the defendant said he was in fear or saw the gun before he shot. Defense counsel again objected, which was followed by an off the record bench conference. At the close of trial, the defense counsel moved for a mistrial based upon the State's comments, which was denied.
This Court must determine whether the comments made by the State were "intended to draw the attention of the jury to the defendant's failure to testify."[110]
Comment on the defendant's failure to take the stand at trial is a trial error, not a structural defect in the proceedings, that has been subject to harmless-error analysis at the federal level since Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Moreover, we have clarified that as a matter of Louisiana law, the mandatory mistrial provisions of La.C.Cr.P. art. 770, which *670 encompass a prosecutor's direct or indirect comment on the defendant's failure to testify, are directives to the trial judge and do not preclude an appellate court from conducting harmless-error analysis. State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94.[111]
In State v. Wormser, the defendant argued that the trial court improperly allowed the prosecutor to comment on his failure to testify.[112] Wormser noted that:
Perhaps the prosecution's statement, during closing argument, that "nobody ever came and took the stand ..." may be construed as a disguised reference to the defendant's failure to testify on his own behalf. But even so, art. 770 applies; and, such a statement constitutes reversible error if the statement was intended to draw the attention of the jury to the defendant's failure to testify. State v. Smith , 433 So.2d 688, 697 (La.1983). When the defendant is the only person who can dispute the testimony, a reference to the testimony or uncontroverted focuses the jury's attention of the defendant's failure to testify. State v. Latin , 412 So.2d 1357, at 1362 (La.1982). However, in the instant case, there were numerous witnesses who could have testified for the defendant; therefore, the prosecutor's remarks did not focus the jury's attention on the defendant's failure to testify. Furthermore, it cannot be inferred that the prosecutor intended to emphasize defendant's failure to take the stand. State v. Smith , 327 So.2d 355 (La.1976).[113]
In the first exchange complained of, that the State improperly noted the defendant "could have given a statement at any time" that comment was in response to the defense counsel's questioning of Det. Brueggeman on cross-examination. Defense counsel was suggesting that if the defendant was ready to make a statement once his attorney was present, Det. Brueggeman had made himself unavailable to receive any such statement. The State was directly responding to defense counsel's argument, noting if the defendant had chosen to make a statement, nothing prevented him from doing so, least of all the absence of Det. Brueggeman. Further, there were multiple witnesses available to the defense to be called to support his claims. The State's comment that "his client was asked to testify for that information" was again in response to the same line of questioning, that the police did not want to bring in the defendant's attorney and hear a statement with the attorney present, so they chose not to interview him with an attorney present at all. Further, the trial court stopped the State from continuing the comment, noting for the jury that the defendant did not have to testify. During jury instructions, the trial court instructed the jury that any comments by the attorneys were not evidence. Finally, the trial court correctly instructed the jury that the State had the burden of proof, and, further, that the State was obliged to disprove any justification defense.
In the second exchange during the State's rebuttal, the State made an argument regarding the defendant's state of mind on his self-defense and defense of others claim. However, the State did not directly reference the defendant's failure to testify. Defense counsel maintained that only the defendant could testify to his state of mind, which the State disputed. The State noted that none of the witnesses testified that the defendant said he was in *671 fear for his life or spoke about what happened afterwards, even though all three were friends. As Odom and the defendant left the French Quarter together, then fled to Mississippi together, it was reasonable to infer that Odom would have some insight to the defendant's feelings and reasons why the he began shooting. It would be perfectly logical for the two friends to discuss what had just happened and resulted in injury to some of the friends in their group. The rebuttal thus constituted further comment on the evidence rather than an impermissible reference to the defendant's failure to testify.
Even if the comments were improper, taken as a whole, it appears that the guilty verdicts were unattributable to the State's comments, and thus any error was harmless.[114] This issue is without merit.
State's Closing and Rebuttal Argument
Finally, the defendant argues that he was deprived of a fair trial because the State made arguments in its closing and rebuttal which (a) attacked defense counsel's statements made to the media which were not in evidence, (b) were not based on the evidence, (c) misstated the evidence and (d) misstated the law. The defendant argues that the trial court should have granted his motion for a mistrial because the totality of evidence was lacking and this improper argument contributed to an unsubstantiated verdict.
La. C.Cr.P. art. 775 provides in part that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." "The standard of review is whether the prosecutor's comments in closing argument rendered the trial fundamentally unfair and the resulting conviction a denial of due process."[115]
Louisiana jurisprudence maintains that a prosecutor has wide latitude when making closing arguments, and that the trial court has broad discretion in controlling the scope of those arguments. State v. Casey, 99-0023, p. 17 (La. 1/26/00), 775 So.2d 1022, 1036. "[E]ven if the prosecutor exceeds these bounds, the court will not reverse a conviction unless 'thoroughly convinced' that the argument influenced the jury and contributed to the verdict." Id., 99-0023,p. 17, 775 So.2d at 1036. "[P]rosecutorial misconduct must be so pronounced and persistent that it casts serious doubts upon the correctness of the jury's verdict." United States v. Rodriguez, 43 F.3d 117, 124 (5th Cir.1995). The "reviewing court should accord credit to the good sense and fair-mindedness of the jury that heard the evidence." Henry, 11-1137, p. 15 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1025.[116]
Specifically, the defendant argued that the State's rebuttal arguments were wholly improper because they went outside the scope of the evidence admitted at trial. The defendant avers that the State made improper references outside the evidence relating to alleged comments made by defense *672 counsel to the media. The State commented on defendant's changing story of what happened, noting that the defense counsel initially claimed to the media that he had an alibi and ultimately led the police on a wild goose chase. The State argued that an alibi means you were not at the scene of the crime, not what the defense later claimed at trial, which was that his bullet did not kill Ms. Thomas. Then the State argued that since the defendant only claimed self-defense once it was clear his alibi claims were futile. Defense counsel objected numerous times, noting that "we're trying the case from the facts from the witness stand." The trial court admonished the State to stick to the facts. A review of the record demonstrates that in the defendant's own closing argument, defense counsel stated "Martin Regan was saying to the press, this case was tried in the [press] first [sic] 75 percent of the facts have been wrong ... right after my client got arrested was, as far as killing Brittany Thomas, ... Why does he have an alibi? He didn't shoot her."
The defendant also contends the State improperly argued that the evidence demonstrated that Benvenuti and Odom were not in fear for their lives when the unknown male (allegedly) pointed a gun at them. The defendant argued this was untrue because Odom and Benvenuti both testified they were in fear for their lives and the defendant saved their lives.
Additionally, the defendant avers that the State misstated the law on several occasions, specifically as to which party had the burden on self-defense and the law on proving self-defense. The defendant objected several times that the statement was contrary to the law. In each instance, the trial court noted that he would give the law to the jury.
Testimony at trial addressed the defendant's changing story (from alibi to self-defense). As noted earlier, at a pre-trial hearing, the defendant sought a reduced bail because he claimed the NOPD possessed video showing the unknown male brandishing a gun while walking down Bourbon Street prior to the shooting. At trial, Lt. Gernon established that because of this defense claim, he located and reviewed additional footage, which showed the unknown male fleeing with two bottles in his left hand. As testimony by Lt. Gernon established, the defendant initially claimed he had an alibi but later claimed the shooting was in self-defense, which represented a change in the defendant's story. Thus, the State argued this changing story misled the police and was based upon evidence presented at trial. The jurors were instructed that argument of counsel was not evidence on multiple occasions.
In the State's rebuttal at trial, it argued that because the defendant did not initially make a self-defense claim, it should be rejected. During closing arguments, defense counsel discussed the reason and evidence as to why the defendant went to Mississippi, to obtain funds for an attorney, arguing it was not due to guilt. The testimony demonstrates that Odom and Benvenuti failed to initially assist police or relate that the defendant acted in self-defense and saved their lives. This evidence supported the State's argument and refuted defense counsel's closing, which provided alternative reasons for Odom and Benvenuti's lack of candor with the police. He argued they failed to come forward because they did not want to get him in trouble, were immature and admittedly suffered from some bad judgment. Further, defense counsel noted Odom later turned himself into police and Benvenuti later cooperated by calling the District Attorney for a meeting.
The defendant contends that the State misstated the law and facts several times *673 during rebuttal. However, the record establishes that the trial court repeatedly instructed the jury that arguments and comments of counsel were not evidence, and that the court would instruct them on the law. The trial court also admonished the State to stick to the facts when discussing statements allegedly made to the press.
Overall, the record does not reflect that the State's rebuttal argument was grossly improper or deprived the defendant of a fair trial. Much of the State's argument was directed to its appreciation of the evidence heard at trial, or lack thereof, and responsive to defense counsel's closing argument. There is nothing to support the defendant's allegation that the State intentionally waited until rebuttal argument to make certain arguments. The jurors were instructed that argument of counsel was not evidence on multiple occasions. As this Court found in State v. Williams :
[I]n the context of the entire record, ... the alleged improper remarks did not influence the jury so that they contributed to the verdict. Thus, in light of the traditional breadth accorded the scope of closing arguments ... the State's closing comments in this case do not merit overturning the defendant's conviction and sentence.[117]
Accordingly, we find the trial court did not err when it denied the defense motions for mistrial. This assignment of error lacks merit.
EXCESSIVE SENTENCE
Assignment of Error No. 6:
The defendant's final assignment of error is that the trial court imposed excessive sentences by sentencing him to the maximum sentence on both counts and by ordering that they be served consecutively. The defendant argues the trial court failed to consider that he was a first-time offender, the unknown male was the initial aggressor, and he believed he was acting in self-defense or defense of others.
At sentencing, the defendant was sentenced to forty (40) years imprisonment at hard labor on Count 1 and twenty (20) years imprisonment at hard labor on Count 2. The court ordered that the sentences run consecutively with each other, but concurrently with any other sentences.
For the reasons set forth above, while this Court affirms the defendant's conviction and sentence for attempted manslaughter, it vacates the defendant's conviction and sentence for manslaughter, entering a judgment of conviction of negligent homicide, and remanding the matter to the trial court for resentencing on that charge.
That being the case, we find the assignment of error that the aggregate term imposed constitutes excessive punishment moot. To the extent that the defendant's excessive sentence claim has been preserved as it relates to the 20-year sentence imposed on the attempted manslaughter count, considering the senselessness of the defendant's conduct which could easily have resulted in the additional loss of life, we do not find the maximum term violates Eighth Amendment guarantees.[118]
CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence for attempted *674 manslaughter, vacate the defendant's conviction and sentence for manslaughter, enter a judgment of conviction of negligent homicide, and remand the matter to the trial court for resentencing on the responsive verdict.
AFFIRMED IN PART, VACATED IN PART, REMANDED FOR RESENTENCING.
BELSOME, J., DISSENTS IN PART AND CONCURS IN PART WITH REASONS
BELSOME, J., DISSENTS IN PART AND CONCURS IN PART WITH REASONS
I concur only in the vacating of the defendant's conviction and sentence for manslaughter, but dissent from the remainder of the majority's opinion.
I disagree that a review of the trial testimony and evidence pertinent to the attempted manslaughter charge, even when viewed in the light most favorable to the State, establishes that the defendant was not acting in self-defense of himself or others. The testimony critical to this issue consists of two eyewitnesses, Mr. Bienvenuti and Mr. Odom, and the testimony from Lieutenant Gernon who was allowed to give his opinion of the how the incident occurred by reviewing video footage.
The testimony presented in this case creates an unusual situation because there were only two witnesses to testify that they were present and saw the shooting. Those witnesses were presented by the State, but their testimony supported the defendant's contention that he acted in self-defense. More specifically, both testified that the unknown male shooter approached their group of friends standing at the corner in an aggressive manner and that the unknown male shooter made a reference to having a "40" which they inferred meant he was armed with a forty-caliber gun. Both testified that the unknown male shooter pulled out his gun, and in response to this threat, the defendant stepped forward and fired to protect himself and his friends. Moreover, Mr. Odom specifically denied in his trial testimony that the unknown male shooter who approached the group on Bourbon Street was one of the two males from an earlier encounter. He was adamant that he had never seen the unknown shooter before he approached their group.
The State sought to refute the relevant testimony offered by Mr. Bienvenuti and Mr. Odom by impugning and impeaching them. As to Mr. Bienvenuti, he was admittedly intoxicated and probably under the influence of MDMA[1] at the time of the incident. Even so, the State does not dispute that Mr. Bienvenuti was already turning away from the unknown male shooter when he was shot by him, suggesting he had seen him brandish his weapon.
As to Mr. Odom, the State showed that he and the defendant fled the shooting scene and then traveled to Mississippi together.
*675 As to both witnesses, the State elicited ample evidence that they refused to cooperate with the police and failed to identify the defendant when given the opportunity to do so or tell the police the details of the incident, in particular, that the defendant was their friend who acted to protect them and himself.
Notably, the State decided not to call the three other people who were with the defendant at the time of the shooting, thereby inferring that their testimony would have been cumulative to the testimony of Mr. Bienvenuti and Mr. Odom that the unknown male shooter had drawn a weapon prior to the defendant firing his weapon.
The State presented the testimony of other victims of the shooting although the defendant was not charged in relation to their injuries. Yet, the victims were only able to identify themselves in the video footage and testified as to why they were on Bourbon Street on the night of the shooting, the nature of their injuries, and the residual impact the shooting had on their lives, if any, but none of them saw the actual shooting or shooters and could not offer relevant testimony as to the defendant's actions.
The State, in an effort to contradict Mr. Bienvenuti and Mr. Odom's testimony regarding the use of force in self-defense, called Lieutenant Gernon to testify. Importantly, Lieutenant Gernon was not present at the time of the shooting and testified solely as to his opinion of what the video footage revealed. One of those observations was that the unknown male shooter returned fire within two seconds of the defendant firing his weapon. Additionally, his interpretation of what he believed the video footage depicted included: (1) the unknown male shooter had one or two beer bottles in his left hand, (2) the unknown male shooter had nothing in his right hand, (3) then had a gun in his right hand, which he fired eleven times, and (4) then fled the scene while still holding two beer bottles in his left hand and nothing in his right hand again.
The only direct evidence presented by the State to meet its burden to the jury of proving beyond a reasonable doubt that the defendant did not act in self-defense was the video footage which was shown repeatedly to the jury in conjunction with witness testimony and is part of the record before this Court. Relying on that video, the State argued that the unknown male shooter could not have been openly brandishing his gun prior to the defendant firing because no one in the general crowd reacted prior to hearing the defendant's shots. No one other than Mr. Bienvenuti and Mr. Odom testified to seeing any gun from either shooter, all the other witnesses that were present recalled reacting to the sound of gunshots not because they saw a gun. In addition to that, the video footage is not very clear, and there is no dispute that the unknown male shooter was armed and fired his weapon repeatedly within two seconds of the defendant firing his gun. Like the defendant, the unknown male shooter fled the scene and did not come forward to cooperate in the police investigation.
The video footage was shown and discussed over and over. The parties did not agree in many respects about what the footage showed, although there was substantial agreement that it reflected the unknown male shooter approaching the defendant's group, coming face to face with Mr. Odom, being pushed back by Mr. Odom, raising his arm up, and then the shooting started. The parties did not agree on whether a gun was in the unknown shooter's hand prior to the defendant firing. The parties agreed that the defendant fired first.
*676 Considering the evidence, the jury presumably accepted the State's witness's Lieutenant Gernon's conclusions that at the time the defendant began shooting, the unknown shooter was only holding two beer bottles and was able to draw a gun with his other hand and begin shooting within two seconds. Otherwise, just viewing the video footage it is impossible to determine with any certainty, that the unknown shooter did not draw his gun first. Lieutenant Gernon used mere speculation, based on the crowd's reaction in the video footage, to contradict Mr. Bienvenuti and Mr. Odom's eyewitness account of the incident.
On this record, even viewing the evidence in the light most favorable to the State, no reasonable juror could have found that the State proved beyond a reasonable doubt that the defendant did not act in self-defense or defense of others. Accordingly, I would vacate the defendant's conviction and sentence for attempted manslaughter.
Additionally, although I agree with the majority's opinion as it pertains to the vacating of the manslaughter conviction, I disagree on the imposition of the lesser included offense of negligent homicide. Given my conclusion that the State failed to carry its burden of proof on the issue of self-defense coupled with the fact that it was not the defendant's bullet that killed the victim, I cannot find sufficient evidence for negligent homicide.[2]

At the time of this incident, then-Sergeant, now Lt. Gernon was the Acting Commander of the New Orleans Police Department (hereinafter "NOPD") Homicide Section.

This Court notes that the video surveillance captured by the different cameras is of varying qualities, making some portions of the videos difficult to clearly view. However, the videos later became a crucial part of the investigation and a key piece of evidence. Much of the focus at trial regarded the footage of the incident, as it was played numerous times, from numerous vantage points for the jury.

Notably, Odom and the defendant were the two parties from the group who later fled to Mississippi.

The defendant shot several other victims, who testified at trial, although the defendant was only charged with the murder of Ms. Thomas and attempted murder of the unknown male shooter.

The State set forth in its opening statement its theory of the case as follows: The defendant played pool with his friends, Justin Odom, Robert Benvenuti, Christian Cooper, Christopher Kelley and Jasmine Parent in Jefferson Parish on the Westbank earlier that day but did not initially join his friends in the French Quarter. Another friend dropped off the group on Canal Street. At about 12:30 a.m, Odom and Cooper were preparing to smoke marijuana, which Odom had in his bag, while hanging with their group. Two black males approached Cooper and asked about purchasing some of the marijuana. Cooper and Odom walked to a side street with the two unknown men. Prior to completing the sale, one of the unknown men pulled out a forty-caliber weapon, saying "I have a 40," placed it against Odom's leg, and demanded his bag. Odom shoved the man away, but he was robbed of his marijuana. At that moment, a police vehicle drove by, startling them and the two unknown men left. Odom was aggravated, called the defendant to tell him about the incident, and asked him to come to the French Quarter. The defendant complied and at approximately 2:30 a.m. was standing with his friends on the corner of Bourbon and Orleans Streets when an unknown male approached. The unknown male walked directly up to Odom and was pushed away. According to the State, the unknown male walked away and when he turned back in the direction of the group, the defendant stepped off the curb and fired four nine-millimeter shots in his direction before running up Bourbon Street toward St. Peter Street. The unknown male responded, firing ten or eleven shots from a forty-caliber weapon down Bourbon Street towards St. Peter Street. The State theorized that the earlier confrontation with the two unknown males and the subsequent shooting were related. The State posited that Odom called the defendant to come to the French Quarter "to handle the situation" after the unknown male pointed a gun at Odom and demanded his marijuana. The State theorized that when the unknown male later approached the group on Bourbon Street, Odom pointed him out to the defendant as "the guy" from the earlier drug deal. The State told the jury that the evidence supported its theory of the defendant as the "enforcer" for the group since (1) the defendant and his friends did not cooperate in the investigation; and (2) a person who acts in self-defense does not respond in the way the video surveillance tapes depicted.

This was a responsive verdict to the attempted second degree murder charge. See La.C.Cr.P. art. 814(A)(4).

State v. Neal , 2000-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657 (citations omitted).

Id.

Second degree murder is the killing of a human being when the defendant "has a specific intent to kill or commit great bodily harm." La. R.S. 14:30.1(A)(1).

State v. Smith, 2011-0664, p. 1 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 379 ; see La.C.Cr.P. art. 814 A(4).

Smith, 108 So.3d at 382.

The element of intent is not in question in this matter.

State v. Abbott, 2017-0016, p. 18 (La.App. 4 Cir. 6/14/17), 222 So.3d 847, 857 (citing State v. De Gruy, 16-0891, p. 2018-19 (La.App. 4 Cir. 4/5/17), 215 So.3d 723, 733 ) ).

We recognized the conflicting jurisprudence in State v. Rouser , 2014-0613, pp. 6-7 (La.App. 4 Cir. 1/7/15), 158 So.3d 860, 866-67 ; a case with one homicide victim and two non-homicide victims, stating:
It is well-settled that in a homicide case where the defendant asserts that he acted in self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Byrd , 12-556, p. 3 (La.App. 4 Cir. 6/5/13), 119 So.3d 801, 804, writ denied , 13-1589 (La. 1/27/14), 130 So.3d 957. However, it is unsettled whether the burden of proof as to a claim of self-defense in a non-homicide situation is: (1) upon the defendant to establish by a preponderance of the evidence that he acted in self-defense; or (2) upon the State to establish beyond a reasonable doubt that the defendant did not act in self-defense. See State v. Fluker , 618 So.2d 459, 463 (La.App. 4th Cir.1993) (the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense); State v. Wischer , 04-325, pp. 8-9 (La.App. 4 Cir. 9/22/04), 885 So.2d 602, 606-09 (the defendant has the burden of proving the affirmative defense of justification, i.e., self-defense, by a preponderance of the evidence).

Id. at 867. See also State v. Taylor, 1997-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 931.

State v. Canales , 2014-0663, p.12 (La.App. 4 Cir. 12/10/14), 156 So.3d 1183, 1191, writ denied , 2015-0048 (La. 11/6/15), 180 So.3d 306 ) (quoting State v. Cooks , 11-0342, p. 11 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 939, writ denied , 12-0112 (La. 5/18/12), 89 So.3d 1189 ) ).

State v. Tate , 2001-1658, p.6 (La. 5/20/03), 851 So.2d 921, 929 (quoting State v. Mussall , 523 So.2d 1305, 1310 (La.1988) ).

Benvenuti was admittedly intoxicated and potentially under the influence of MDMA at the time. MDMA stands for methylenedioxymethamphetamine, often referred to as "molly." Benvenuti admitted that he initially failed to identify Odom or the defendant, failed to tell police that he saw the incident and that the defendant acted in self-defense. Testimony by Benvenuti revealed he was a felon, convicted of aggravated burglary and he was not allowed to carry a weapon. Benvenuti also acknowledged that prior to and following this incident, he sold drugs in the French Quarter. He maintained he was not selling drugs that night and the shooting was unrelated. The State questioned him at trial regarding text messages, dated June 29, 2014, around 9:00 p.m. following the shooting. In text messages between himself and an unidentified friend, he indicated that he would be out on Bourbon Street "taxing them tourists" for "them pains, molly and loud" meaning he would be selling drugs.

Odom testified that he had been drinking and smoking marijuana prior to the shooting. He testified that even though he had an attorney present when he made his statement to police, he denied knowing the defendant. Odom had two misdemeanor convictions for marijuana, along with a pending marijuana charge. Odom also admitted to bringing marijuana with him to the French Quarter to smoke, and would sometimes sell it if asked.

The defendant cited to State v. Kemp, 2000-2228 (La. 10/15/02), 828 So.2d 540.

Benvenuti testified that the unknown male initially walked past them, but turned back around to his group when Odom, acting as the initial aggressor, asked the unknown male "what are you looking at?" Prior to the shooting, Benvenuti testified Odom then "shoved [the unknown male] back with his hand" and the unknown male began to step back. At that point, Benvenuti indicated he witnessed a gun under the arm of the unknown male, so he turned to move away. While Benvenuti initially testified that he saw the unknown male raise and point the gun, later during that same testimony, he admitted that he did not see him raise and point the gun. Benvenuti's back was turned away from the unknown male when he was shot, suggesting he could not have seen him brandish his weapon prior to the defendant firing first. Further, despite admitting that he did not see the earlier attempted robbery, Benvenuti testified that the unknown male shooter was not one of the same men who attempted to rob Odom earlier that day.

The day after the shooting.

State v. Tate, supra .

Benvenuti was admittedly intoxicated.

State v. Kirk , 2011-1218, p.9 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 941, writ denied sub nom. State ex rel. Kirk v. State , 2012-2023 (La. 2/8/13), 108 So.3d 80.

State v. Gray , 2016-0687, p.9 (La. 3/15/17), 218 So.3d 40, 47, reh'g denied (5/1/17); See also State v. Fuller , 418 So.2d 591, 593 (La. 1982) (citing State v. Davies , 350 So.2d 586 (La.1977).

A review of the jury charges in this case reflects that the trial court instructed the jury that the charge of manslaughter was based upon La. R.S. 14:31(2)(a), in particular the portion pertaining to the perpetration of an intentional misdemeanor directly affecting the person:
The defendant is charged with manslaughter by the killing of Brittany Thomas. Manslaughter is the killing of a human being when the defendant is engaged in the commission or attempted commission, perpetration or attempted perpetration of an aggravated battery, aggravated assault with a firearm or illegal use of a firearm, even though there is no intent to kill.

"Homicide is the killing of a human being by the act, procurement, or culpable omission of another" and includes second degree murder and manslaughter. La. R.S. 14:29.

The specific statutory provisions are crucial because in Louisiana there are no common-law crimes, a crime is only "that conduct which is defined as criminal in [the Louisiana Criminal Code], or in other acts of the legislature, or in the constitution of this state, per La R.S. 14:7. Courts are not empowered to extend the terms of a criminal provision to cover conduct which is not included within the definition of the crime. See State v. Arkansas Louisiana Gas Co., 227 La. 179, 78 So.2d 825, 827 (1955).

State v. Myers , 1999-1847, p. 7 (La. 4/11/00), 760 So.2d 310, 315 (quoting La. R.S. 14:31(A)(2) ).

State v. Garner , 238 La. 563, 115 So.2d 855, 864 (1959) (citation and internal quotation marks omitted).

State v. Garner , 238 La. 563, 115 So.2d 855, 857 (1959).

Id.

Id.

Id. at 856.

State v. Small, 2011-2796, p. 12, 100 So.3d 797, 806 (citing State v. Myers, 99-1849 (La. 4/11/00), 760 So.2d 310 ; State v. Kalathakis, 563 So.2d 228 (La. 1990) ; and Garner, supra. ) ).

Garner, 115 So.2d at 864.

Neal , supra.

See Garner, supra., Small, supra.

The State does not address the clear import of Garner and its progeny except to argue that the cases are "factually dissimilar." Rather, the State relies on a footnote in which the Court recognized that several other states are in accord with Louisiana law on the agency test, some of which have held that a defendant who engages in a gun battle with others could be found culpable for the death of a bystander on the theory that the participants in the gun battle were co-perpetrators. The State maintains that we should adopt the case law out of those jurisdictions. That principle is simply not consistent with current Louisiana law. Based on the law in Louisiana, together with the facts, and evidence presented we do not find the State's argument persuasive.

La. C.Cr.P. art. 821(E) provides:
If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post-verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
See also State ex rel. D.J. , 2008-345, p.6 (La. App.3 Cir. 8/28/08), 995 So.2d 1, 6.

"However, under State v. Byrd , 385 So.2d 248 (La.1980), and La. C.Cr.P. art. 821(E), discharge of the defendant is neither necessary nor proper when the evidence presented at trial does not support the verdict returned but does support a responsive verdict or lesser included grade of the offense." State v. Higgins , 2003-1980, p.18 (La. 4/1/05), 898 So.2d 1219, 1232.

La. C.Cr.P. art. 814

State v. Small , 2011-2796, p.11 (La. 10/16/12), 100 So.3d 797, 805-06 (quoting La. R.S. 14:32) ). See also State v. Desoto , 2007-1804, p.8 (La. 3/17/09), 6 So.3d 141, 147.

State v. Martin , 539 So.2d 1235, 1238 (La. 1989).

State v. Small , 2011-2796, p.11 (La. 10/16/12), 100 So.3d 797, 805-06 (quoting La. R.S. 14:12) ).

State v. Parker , 431 So.2d 114, 115 (La. Ct. App.), writ denied , 435 So.2d 433 (La. 1983)

Id.

Id.

State v. Desoto , 2007-1804, p.9 (La. 3/17/09), 6 So.3d 141, 147.

Martin , 539 So.2d at 1238.

Small , 100 So.3d at 805-06 (quoting La. R.S. 14:12) ).

The defendant was carrying a concealed weapon when he arrived in the French Quarter prior to the shooting.

La. R.S. 14:12.

Ms. Acosta, a firearms' toolmark examiner with the NOPD, testified at trial. Ms. Acosta tested the cartridge cases recovered from the scene of the crime, concluding that only one nine-millimeter caliber firearm and one forty-caliber firearm were used.

State v. Loyden , 2004-1558, p.17 (La.App. 3 Cir. 4/6/05), 899 So.2d 166, 178.

State v. Marlowe , 2010-1116, p.35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 966, writ denied , 2012-0231 (La. 5/18/12), 89 So.3d 1191 (citations omitted).

The defendant cites State v. Miller , 2014-0406 (La.App. 4 Cir. 2/25/15), 160 So.3d 1069, in which this Court found that the trial court erred in allowing the State to elicit testimony from an experienced homicide detective on what would constitute a justifiable homicide in a manner which was designed to elicit the detective's opinion as to the ultimate question of the defendant's guilt or innocence in violation of La. C.E. Art. 704. However, the error was found to be harmless. See also State v. Berniard , 2014-0341 (La.App. 4 Cir. 3/4/15), 163 So.3d 71.

State v. Marlowe , 2010-1116, pp.35-36 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 966, writ denied, 2012-0231 (La. 5/18/12), 89 So.3d 1191 (citing State v. Lanclos , 2007-0082, p. 6 (La. 4/8/08), 980 So.2d 643, 648 ) ).

State v. Walker , 2016-293, p.8 (La.App. 5 Cir. 12/14/16), 206 So.3d 474, 482, writ denied , 2017-0190 (La. 9/29/17), 227 So.3d 284

State v. Gray , 2014-1213, p.9 (La.App. 4 Cir. 11/25/15), 179 So.3d 936, 941, writ denied , 2016-0006 (La. 1/13/17), 215 So.3d 241.

State v. Jacobs , 2007-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 580, writ denied , 2011-1753 (La. 2/10/12), 80 So.3d 468.

Gray , 179 So.3d at 941.

State v. Odenbaugh , 2010-0268, p.54 (La. 12/6/11), 82 So.3d 215, 251.

State v. Bell, 1999-3278, p. 6 (La. 12/8/00), 776 So.2d 418, 421-22 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ).

Ms. Acosta testified that the casings from the nine-millimeter gun matched a 2012 item number placed in the National Integrated Ballistic Identification Network (hereinafter "NIBIN"). NIBIN is an investigative tool, which allows police to enter ballistic information to determine if there is a match to an earlier casing connected with another crime.

State v. Loyden , 2004-1558, p.17 (La.App. 3 Cir. 4/6/05), 899 So.2d 166, 178.

La. C.E. art. 401, State v. Buffington , 1997-2423, p.22 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 352.

Buffington , 731 So.2d at 352.

State v. Odenbaugh , 2010-0268, 53-54 (La. 12/6/11), 82 So.3d 215, 251.

A review of the police report contained in the record demonstrated that a Detective Maggie Darling and Detective Anthony Pardo interviewed Cooper on July 4, 2014. The police report notes that Cooper had been identified as a witness to the shooting, based on comments Cooper made on social media. Cooper was brought in for questioning as a result. The written summary of Cooper's statement says he told the police "that the shooting was over a 'Drug Deal' gone bad," but he had no additional details to provide.

Odenbaugh , 82 So.3d at 252.

State v. Berniard , 2014-0341, pp. 23-24 (La.App. 4 Cir. 3/4/15), 163 So.3d 71, 87.

176 So.3d 761, 766-67, writ denied , 2015-2250 (La. 2/5/16), 186 So.3d 1167.

State v. Le , 2015-0455 (La.App. 4 Cir. 5/27/15), 188 So.3d 1072.

See State v. Brown , 2015-0855, p.9 (La.App. 4 Cir. 10/21/15), 176 So.3d 761, 767, writ denied , 2015-2250 (La. 2/5/16), 186 So.3d 1167 ) ), stating that "because we are mindful of the well-established rule that the denial of a writ does not have any legal effect and because we intend to rule on the merits of the issue raised by Ms. Brown, we have purposely decided to exercise our supervisory jurisdiction and have granted Ms. Brown's writ application notwithstanding that our ruling results in the denial of relief."

Scott v. Am. Tobacco Co ., 2009-0461, p.6 (La.App. 4 Cir. 4/23/10), 36 So.3d 1046, 1051, writ denied , 2010-1358 (La. 9/3/10), 44 So.3d 686, and writ denied , 2010-1361 (La. 9/3/10), 44 So.3d 707 (See Hutchison v. Murphy Oil USA, Inc., 04-2648, p. 1 n. 2 (La. 1/14/05), 892 So.2d 569, 570 (Calogero, C.J., concurring in the denial of certiorari) ).

Id.

Id.

The invoice indicated that the defendant had paid $9,000.00 in fees but owed $18,231.02 as of December 29, 2015. It appears the defendant filed the same motion on December 28 and December 29, 2015, but supplemented the second filed motion with the affidavit from the defendant.

The request for special funding was denied in an email sent to all parties by the trial court on December 30, 2015. See State v. Le. 2016-0001 (La.App. 4 Cir. 1/7/16) (unpub) This Court denied the writ of review from the denial of the motion. It is noted that this motion was filed less than two weeks prior to trial. No earlier request for funding is in the record.

See State v. Le , 2016-0018 (La.App. 4 Cir. 1/7/16) (unpub) (where the supervisory writ seeking review of this ruling was denied by this Court.)

At the hearing, defense counsel indicated he expected to have a hearing on indigency, where the defendant would be examined under oath as to his financial circumstances. Defense counsel objected to the denial of the hearing but he failed to make a proffer of additional evidence (for this court's review) to support his request for a hearing to declare the defendant indigent.

The trial court noted that since the defendant had never been determined indigent prior to or at arraignment, he was "past the point of determining indigency at this point."

This Court denied the writ. In Judge Tobias' concurrence, he noted that "I cannot say that the trial judge has abused his discretion in refusing to hold a hearing based upon the literal language of La. R.S. 15:175 A(1)(a) and his precise assigned error that '[t]he trial court abused its discretion when it denied the defendant's request for an expedited hearing to determine whether the defendant was indigent.' "

State v. Frank , 1999-0553, p.5 (La. 1/17/01), 803 So.2d 1, 8, as revised (4/16/01).

State v. Touchet , 1993-2839, p. 6 (La. 9/6/94), 642 So.2d 1213, 1216.

Id.

1999-0553, p.7 (La. 1/17/01), 803 So.2d 1, 9 (citing State v. Madison, 345 So.2d 485, 490 (La. 1977).

Id.

Id. at 6.

Id . at 5

Id. at 8.

The defendant made no claim she was insane or incompetent to go to trial, thus she was not entitled to admit psychiatry evidence during the guilt phase of trial.

Id. at 11.

Id.

Id.

State v. Amos , 2015-0954, p.18 (La.App. 4 Cir. 4/6/16), 192 So.3d 822, 833.

State v. Garrick , 2003-0137, pp. 5-6 (La. 4/14/04), 870 So.2d 990, 993.

Id. at 994 (quoting State v. Kemp, 00-2228, p. 7 (La. 10/15/02), 828 So.2d 540, 545 ) ).

State v. Harris, 2001-2730, pp.14-15 (La. 1/19/05), 892 So.2d 1238, 1250 (citing State v. Kemp, 2000-2228, pp. 7-9 (La. 10/15/02), 828 So.2d 540, 545-546.

State v. Monroe , 2015-1151, pp.13-14 (La.App. 4 Cir. 8/10/16), 198 So.3d 259, 267, writ denied , 2016-1698 (La. 6/5/17), 220 So.3d 752 (quoting State v. Tillman, 2010-1717, p. 5 (La.App. 4 Cir. 9/28/11), 74 So.3d 761, 764 ) ).

La. C.Cr.P. art. 774 provides in pertinent part that "[t]he state's rebuttal argument shall be confined to answering the argument of the defendant."

State v. Wormser , 467 So.2d 58, 60 (La. Ct. App.), writ denied, 474 So.2d 946 (La. 1985).

State v. Thomas , 2005-2373, pp.1-2 (La. 4/17/06), 926 So.2d 490, 491.

Wormser , 467 So.2d at 60.

Id.

State v. McQuarter , 2000-1553 (La.App. 4 Cir. 6/6/01), 788 So.2d 1266.

State v. Williams , 575 So.2d 452, 455 (La. Ct. App.), writ denied , 578 So.2d 130 (La. 1991) (citing Darden v. Wainwright , 477 U.S. 168, 178-81, 106 S.Ct. 2464, 2470-71, 91 L.Ed.2d 144 (1986) ).

State v. Greenberry , 2014-0335, pp.18-19 (La.App. 4 Cir. 11/19/14), 154 So.3d 700, 710-11, writ denied , 2014-2656 (La. 10/9/15), 178 So.3d 1000.

2015-0866, p. 12 (La.App. 4 Cir. 1/20/16), 186 So.3d 242, 250.

As set out in State v. Walker , 2015-1026, pp. 8-9 (La.App. 4 Cir. 4/6/16), 192 So.3d 813, 818 :
"Excessive sentences are prohibited under the Eighth Amendment of the United States Constitution and La. Const. art. I, § 20." [State v. ]Smith , 11-0664, p. 23, [ (La.App. 4 Cir. 1/30/13) ] 108 So.3d at 390. "A sentence may be constitutionally excessive even when the sentence falls within the range permitted by statute." Id. (citing State v. Sepulvado , 367 So.2d 762, 769 (La.1979) ). "For a sentence to be found excessive, it must be 'so grossly disproportionate to the crime committed, in light of the harm caused to society, as to shock our sense of justice.' " Id. (citing State v. Cann , 471 So.2d 701, 703 (La.1985) ). A sentence is also unconstitutionally excessive when "it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering." State v. Jarreau , 07-1052, p. 6 (La.App. 4 Cir. 3/26/08), 982 So.2d 876, 879 (citing State v. Bonanno , 384 So.2d 355, 357 (La.1980) ).

MDMA stands for methylenedioxymethamphetamine, which is often referred to as "ecstasy."

I agree with the majority that it is not necessary for the defendant to be the shooter that killed the victim in order to be guilty of negligent homicide. However, to find that the defendant's actions were a gross deviation from the standard of care expected under like circumstances would require that the State had disproved the defendant's self-defense claim, which they did not. Unlike in Parker , this defendant saw his attacker and the attacker was brandishing a gun.