Judge Regina Bartholomew-Woods
Defendant, Dominique Jenkins (hereinafter referred to as Defendant), appeals the jury's verdict finding him guilty of manslaughter and the district court's October 20, 2017 judgment sentencing him to thirty-eight (38) years imprisonment at hard labor. For the reasons that follow, we affirm Defendant's conviction and sentence.
STATEMENT OF THE CASE
On December 11, 2014, a grand jury returned a true bill of indictment charging Defendant, Howard Taylor ("Mr. Taylor"), and Vernon Clay ("Mr. Clay") each with one count of second degree murder in violation of La. R.S. 14:30.1.[1] Defendant appeared for arraignment and entered a plea of not guilty on January 29, 2015. On August 14, 2015, the district court held a hearing on the motion to suppress the statement of Defendant and co-defendants. The district court rendered its ruling on December 9, 2015, granting the motion to suppress Mr. Taylor's statements and denying the suppression of Mr. Clay's and Defendant's statements. The State of Louisiana ("the State") and Mr. Clay objected and noticed their intent to seek writs.[2] On April 21, 2017, Defendant filed a motion to sever his case from Mr. Taylor and Mr. Clay requesting that each have separate *1180 trials, which the district court granted. Subsequently, Mr. Clay withdrew his plea of not guilty and entered a plea of guilty to accessory after the fact and to being a second felony offender.[3] On August 9, 2017, the State filed a motion in limine to exclude Mr. Taylor's statement, which the district court granted.[4] In response, Defendant filed a writ application for supervisory review of the district court's ruling. This Court and the Louisiana Supreme Court both denied Defendant's writ application. State v. Jenkins , 2017-0756, p. 1 (La. App. 4 Cir. 9/6/17), writ denied , 2017-1521 (La. 9/8/17), 225 So.3d 475.[5]
The jury trial commenced on September 13, 2017, and on September 15, 2017, the jury returned a ten-to-two verdict finding Defendant guilty of manslaughter, a violation of La. R.S. 14:31.[6] On October 2, 2017, Defendant filed motions for a new trial and post-verdict judgment of acquittal, which the district court denied. On October 20, 2017, Defendant was sentenced to thirty-eight (38) years of imprisonment at hard labor with credit for time served. Defendant filed a motion to reconsider sentence, which the district court denied. Defendant now files this appeal and asserts six (6) assignments of error including two pro se assignments of error.
STATEMENT OF FACTS
In the early morning hours of June 25, 2014, Detective Chris Laborde of the Eighth District, as well as other members of the New Orleans Police Department ("NOPD"), responded to a call of an aggravated battery by shooting that occurred in the 500 block of Frenchman Street. The victim of the shooting was Julius Dunn ("Mr. Dunn"). A cursory investigation occurred in which several photos were taken of the area and two shell casings were recovered. Mr. Dunn was injured on the scene and taken to the hospital where he later succumbed to his injuries.
Detective Vaught's Testimony
Detective Ryan Vaught ("Detective Vaught") of the NOPD Homicide Division was then assigned the case. Detective Vaught was able to obtain video surveillance footage of the shooting from several establishments in the area.[7] In his narration of the surveillance video obtained from Club Vaso ("Vaso"), Detective Vaught testified that Defendant, Mr. Clay, and Mr. Taylor exited the club and headed *1181 toward Decatur Street. The same surveillance video showed Mr. Dunn and a group of friends exiting Vaso on Frenchmen Street walking along the sidewalk toward Chartres Street.[8] Further, the video showed Mr. Dunn, Defendant, Mr. Clay, and Mr. Taylor engage in a verbal discussion outside of Vaso.
The surveillance footage from Louisiana Music Factory showed Defendant, Mr. Clay, and Mr. Taylor exit Vaso; Defendant is seen turning back toward Vaso and Mr. Dunn and his group of friends as Defendant walked away. Defendant, Mr. Clay, and Mr. Taylor, subsequently, exited the camera frame. Shortly thereafter, a white SUV, with its headlights off, pulled out of a parking lot on Decatur Street. During his investigation, Detective Vaught discovered Defendant, Mr. Clay, and Mr. Taylor occupied the white SUV on the night of the shooting.
On the surveillance video obtained from the Blue Nile, the white SUV is seen with the brake lights illuminated, indicating that it was slowing or stopping. Then, people are seen reacting to something and Mr. Dunn is seen holding his stomach while running outside of the camera frame. According to Detective Vaught, the shooting occurred at the Blue Nile. He summarized that the white SUV pulled out of a parking lot located on Decatur Street near Elysian Fields Avenue with its headlights off, traveled westbound on Decatur Street, and turned right on Frenchman Street heading northbound, passing several businesses and continued to the Blue Nile where the shooting happened, and then continued to travel northbound on Chartres Street to Royal Street where it turned left.
During Detective Vaught's investigation, he discovered one of the friends with Mr. Dunn that night was Daniel Bryant ("Mr. Bryant") who was near Mr. Dunn when he was shot. Detective Vaught interviewed Mr. Bryant the day after the homicide. During the interview, Mr. Bryant showed an Instagram photograph of Defendant and Mr. Clay on his cellphone and identified both men by name, assigning Defendant as the shooter.[9] Detective Vaught stated that he printed out the photograph and both Mr. Bryant and Detective Vaught signed it. After this interview, Detective Vaught performed a query search of the names of Defendant and Mr. Clay to obtain any records[10] . He obtained a search warrant for the Instagram account associated with the photograph. Thereafter, he received a data compact disc from Instagram containing information for the account of "Shawtyy_too_turnt;" the account contained more than a hundred photographs of Defendant, but not many photographs of Mr. Clay or Mr. Taylor. The court record reflects that this Instagram account belonged to Defendant.
Detective Vaught conducted a second interview with Mr. Bryant and his attorney, Dante Butler ("Mr. Butler"), wherein Mr. Bryant identified Defendant and Mr. Clay as two of the three suspects in the surveillance footage. Further, Mr. Bryant confirmed the identities of Defendant and Mr. Clay when the photographs were presented.[11]
*1182 During his investigation, Detective Vaught learned that Defendant and Mr. Clay were cousins. After this interview, Detective Vaught applied for arrest warrants for Defendant and Mr. Clay. After reviewing the photographs and information posted on Defendant's Instagram account, Detective Vaught identified the third suspect as Howard Taylor.
Detective Vaught gave a description and a picture of the white SUV seen in the surveillance footage to a Jefferson Parish Sheriff's Office ("JPSO") detective, who provided a license plate number matching a vehicle with a similar description; the vehicle had South Carolina plates. It was discovered that Jasmine Branch ("Ms. Branch") was issued a traffic citation while driving that vehicle in Jefferson Parish. However, Detective Vaught was unable to search the vehicle because Ms. Branch had informed him the car had been wrecked in the interim between the shooting and the interview.[12]
Detective Vaught discovered that Ms. Branch was Mr. Taylor's girlfriend. A photo of a bail bond receipt evincing her name was posted on Defendant's Instagram account; the bail bond receipt was for Mr. Taylor. Detective Vaught interviewed Mr. Clay and Mr. Taylor, but declined to apply for arrest warrants for them. Nevertheless, both were indicted for the crime.
Defendant agreed to give a recorded statement, which the State played in open court. Detective Vaught read Defendant his Miranda Rights. On the recording, Defendant, who admitted his nickname was "Shawty," stated that some time in June 2014, he went to Vaso with his cousins, Mr. Clay and "Donald."[13] Defendant stated that sometime later, the three men (himself, Mr. Clay, and Donald) decided to leave Vaso and proceeded to Donald's green Infinity SUV to leave the area. Defendant denied that he was ever inside of a white SUV at any time that night and stated that he was only with Mr. Clay and Donald. When Detective Vaught told Defendant that he received information that did not corroborate his story, Defendant stated he did not know why anyone would implicate him in this crime and elected to end the interview.
Detective Laborde and his team recovered two shell casings from the scene along with Mr. Dunn's belongings including clothing, a cellphone, and other items. A pellet was recovered during Mr. Dunn's autopsy, but there was no DNA or fingerprint evidence to test.
On cross-examination, Detective Vaught admitted that none of the surveillance videos obtained show footage of the parking lot where the white SUV pulled out from or footage that revealed the occupants inside of the vehicle. He also admitted the he could not recall whether crime scene technicians took any measurements between where Mr. Dunn collapsed and the location where the shell casings were recovered. On redirect examination, Detective admitted that he was discontented with the lack of evidence recovered from the crime *1183 scene and the inadequacies of the investigative procedure prior to his involvement.
After Detective Vaught testified, the State called Mr. Bryant to testify, but he refused. The State requested that Mr. Bryant be declared a hostile witness, which the district court granted. After speaking with his attorney, Mr. Bryant testified that he was currently serving a sentence in the Department of Corrections for convictions unrelated to the current matter. Mr. Bryant also invoked his Fifth Amendment privilege, which the district court declined to recognize.[14] Consequently, the record reflects that Mr. Bryant testified that he was not offered anything in exchange for his testimony, but still refused to testify. On cross-examination, Mr. Bryant further refused to testify.[15]
The State recalled Detective Vaught to the stand. Detective Vaught testified that he was familiar with Mr. Bryant from prior encounters. Detective Vaught also testified that he had taken the recorded statement by Mr. Bryant the day after the shooting. The State attempted to introduce and publish the recorded statement, but Defendant objected on grounds that it violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. The district court sustained Defendant's objection.[16]
Sean McElrath's Testimony
The State then called Sean McElrath ("Mr. McElrath"), an NOPD employee, to the stand. Mr. McElrath is a firearms examiner for the Crime Lab. Mr. McElrath was qualified as an expert in the field of firearms identification. Mr. McElrath examined the ballistics evidence in this matter and examined six (6) specimens; two (2) of the specimens were forty-five caliber cartridge casings and Mr. McElrath was able to determine that both were shot from the same weapon. The other four specimens were projectile fragments recovered from Mr. Dunn's body and at least one of the projectile fragments was consistent with forty-five class ammunition.
On cross-examination, Mr. McElrath testified that his examination revealed that only one gun was used and explained the process of the reaction produced when this type of gun is fired. Mr. McElrath described the reaction as a "mini-explosion" that produces a flame inside of the gun chamber that explodes the projectile out of the barrel of the gun. The flame produces a "muzzle flash," which varies in visibility when this gun is fired; however, the "muzzle flash" is more visible at night. Mr. McElrath stated he was not presented with the actual firearm for testing and had no information to identify the shooter.
On re-direct examination, Mr. McElrath testified, after reviewing the surveillance footage, he did not see a "muzzle flash" inside of the white SUV; however, he testified that this did not negate the fact that one could have gone off, but that he simply *1184 could not see because of the quality of the surveillance video. Mr. McElrath further testified that too many variables existed to determine the location of the gun when fired based solely on the location of the shell casings recovered at the scene.
Dr. Cynthia Gardner's Testimony
The State's next witness was Dr. Cynthia Gardner ("Dr. Gardner"). Dr. Gardner is a forensic pathologist and New Orleans Coroner's Office Deputy Coroner who performed Mr. Dunn's autopsy and authored the autopsy report. Dr. Gardner testified that Mr. Dunn suffered from one gun shot in his lower chest, but there was no exit wound. She further testified that Mr. Dunn suffered from internal injuries. The autopsy report indicates that the bullet and its fragments punctured Mr. Dunn's stomach, liver, inferior vena cava, diaphragm, right lung, and ninth rib. Dr. Gardner testified that she did not find any gunpowder residue or stippling on Mr. Dunn's body. She determined that the cause of death was a homicide.[17] On cross-examination, Dr. Gardner testified that she could not determine the identity of the shooter.
Mr. Butler's Testimony
The State called Mr. Butler, the attorney for Mr. Bryant, to the stand. He relayed that Mr. Bryant willfully gave a statement to the police prior to trial, but had since changed his mind regarding testifying at trial. A third party informed him that Mr. Bryant had received threats via social media.[18] After learning of this information, Mr. Butler informed the State and Mr. Bryant. Notwithstanding the aforementioned, Mr. Bryant never indicated his knowledge of the threats or expressed fear for his life if he testified.
On cross-examination, Mr. Butler reiterated that Mr. Bryant was not aware of the social media posts or that his initial refusal to testify was attributed to fear because of these posts. He also admitted that Mr. Bryant had sought assistance with the sentence he received in Jefferson Parish and did not want to testify if the State was unwilling to "help."[19] However, Mr. Butler also testified that Mr. Bryant did intend to cooperate by testifying at trial.[20] On re-direct examination, Mr. Butler reiterated that Mr. Bryant had not received any assistance for his guilty plea in Jefferson Parish and intended to testify.
Mr. Bryant's Testimony
The State re-called Mr. Bryant to the stand. The State asked Mr. Bryant why he was now testifying despite his initial refusal. He responded that he "just needed time to think about it."[21] Mr. Bryant identified Mr. Dunn as his cousin and confirmed that they were together, along with two other *1185 men, at Vaso the night of the shooting. He testified that he only knew one of the men as DJ. Mr. Bryant stated that he saw Defendant and Mr. Clay outside Vaso; he and Defendant "passed words." There had been prior altercations with both Defendant and Mr. Clay. He explained that the three of them (Mr. Bryant, Mr. Clay, and Defendant) had been at odds for some time. Prior to the night of the shooting, Mr. Bryant had never seen them at Vaso, but he "knew it was going to be something."
The State then directed Mr. Bryant to testify as to the sequence of events that led up to the shooting. According to Mr. Bryant, as Defendant and Mr. Clay left Vaso, he observed them walk up Decatur Street; both men continually looked back at Mr. Bryant and his group as they walked. Shortly thereafter, the group decided to leave Vaso and started walking up Frenchman Street to their parked vehicle. As they walked, he noticed the white SUV, with Defendant inside, approaching. He identified Mr. Clay as the front seat passenger and Mr. Taylor as the driver.[22] Upon seeing the vehicle, Mr. Bryant shouted "[t]hat's them," and the group stopped walking. He saw Defendant roll down the rear window, pull out the gun, and shoot; the group turned and ran.
Mr. Bryant stated that after the vehicle was out of sight, the group stopped running; it was at this time that Mr. Dunn noticed that he had been shot and collapsed. According to Mr. Bryant, he called for someone to call the ambulance and waited at the scene until Mr. Dunn was transported to the hospital, but did not talk to any police. The next day, he spoke to police and identified a photograph of Defendant and Mr. Clay from an Instagram account.[23]
He knew something was going to happen when he saw Defendant in the back seat of the white SUV. The State played the surveillance footage, and Mr. Bryant narrated the moment he noticed Defendant pull out the gun and point it out of the rear window.[24] Mr. Bryant further testified that he had no personal knowledge of any threats made toward him prior to the trial. However, his family informed him that they saw social media posts suggesting that Mr. Bryant was a "rat." When the State showed him copies of the social media posts, Mr. Bryant testified that he had never seen these posts. He also confirmed that his nickname was "Diesel" as evinced in the social media posts.
On cross-examination, Mr. Bryant testified that Detective Vaught made initial contact with him via telephone. After this conversation, Mr. Bryant agreed to go to the police station to give a statement only if it was "off the record" because he did not want his name to be in the police report.[25] Defendant's counsel played the surveillance footage again and directed *1186 Mr. Bryant's attention to the white SUV. When questioned as to whether Defendant was hanging out of the window at any point, Mr. Bryant admitted that Defendant is not seen on the video hanging out of the window, because Defendant was not actually hanging out of the window at the time the shots were fired. Mr. Bryant also admitted that he did not see a "muzzle flash" when the shots were fired. Mr. Bryant also explained that, about a year prior to the shooting, he had a feud with Mr. Clay that began when the two engaged in a vehicle chase during which Mr. Clay fired a gun at him several times causing him to drive his vehicle off the road. Mr. Bryant denied knowing the reason for the chase. He further testified that Mr. Clay and two other individuals shot at his house, while his mom, brother, and father were inside of the home. Mr. Bryant testified that Defendant was not with Mr. Clay when this incident occurred. However, some time thereafter, Mr. Bryant testified that he had an exchange with Defendant and Mr. Clay at a gas station, but stated Defendant did not have a gun on this occasion.[26] He also testified that he was not in fear of testifying or afraid of Defendant.
On re-direct examination, the State asked Mr. Bryant to confirm what he saw when the white SUV approached him and the group. In response, Mr. Bryant identified Defendant in the courtroom and testified that he was certain that Defendant was the shooter.
Deddie Dunn's Testimony
The State's final witness was Deddie Dunn ("Ms. Dunn"), Mr. Dunn's mother. She testified that she was aware that Mr. Dunn and Mr. Bryant would hang out together, but did not know Mr. Dunn was out with Mr. Bryant on the night of the shooting. She thought Mr. Dunn was on his way back to Alexandria.[27] On the day after the shooting, Mr. Bryant went to her house, but did not share any details about the shooting.
Detective Vaught's Testimony
In his case-in-chief, Defendant re-called Detective Vaught, Defendant's only witness. Detective Vaught recalled that Mr. Bryant stated that the back windows to the white SUV were tinted; however, he had sufficient visibility inside of the vehicle. He further testified that Mr. Bryant had clear visibility of Defendant once the window was down and saw him holding a semi-automatic hand gun in his left hand. Detective Vaught also admitted his uncertainty regarding the approximate location where Mr. Dunn collapsed. He further reiterated his dissatisfaction with how the preliminary investigative procedure was conducted and the evidence recovered from the scene.
Detective Vaught, on cross-examination, testified that Mr. Bryant's statements made during the interviews corroborated the surveillance footage. He also testified that the majority of Defendant's recorded statement contradicted the surveillance footage and other evidence recovered during his investigation. Detective Vaught further testified that he interviewed Donald Isom who failed to corroborate Defendant's statement.
On redirect examination, Detective Vaught confirmed that there was no surveillance footage recovered that showed Defendant enter the white SUV in the parking lot. He also testified that he could not recall if there was another exit in the *1187 parking lot where the green Infinity could have possibly exited.
DISCUSSION
Errors Patent
A review of the record does not reveal any errors of patent.[28]
Assignments of Error
Defendant asserts the following assignments of error, as well as two (2) pro se assignments of error:
(1) Whether the district court erred in determining Mr. Taylor's statement was not proper impeachment evidence;
(2) Whether the district court erred in allowing the State to continue to question Mr. Bryant regarding threats made to him and/or his family over the objections of Defendant's counsel;
(3) Whether the district court erred in denying Defendant's request for jury instructions that jury's verdict should be unanimous as opposed to a ten person majority; and
(4) Whether the district court erred in accepting the non-unanimous verdict as a legal one.
Pro Se Assignments of Error:
(1) Whether the district court erred in determining Mr. Bryant's testimony was proper; and
(2) Whether the district court erred in denying the admission of Mr. Taylor's statement.
For the reasons that follow, we find that the assignments of error lack merit.
Assignment of Error No.1 and Pro Se Assignment of Error No. 2
In his first assignment of error, Defendant asserts that the district court erred in ruling Mr. Taylor's statement was improper impeachment evidence. At trial, Defendant argued that the use of Mr. Taylor's statement should be permitted as extrinsic evidence to attack the credibility of Mr. Bryant's testimony by eliciting testimony from Detective Vaught that he received information contradictory to Mr. Bryant's testimony. Defendant also argued that the substance of Mr. Taylor's statement would not be used for the truth of the matter asserted, but for impeachment purposes only.
Similarly, in Defendant's pro se appellate brief, he argues that the district court erred in ruling Mr. Taylor's statement inadmissible. Defendant argues that Mr. Taylor's statement is inculpatory and, as such, should have been deemed non-hearsay because of his failure to testify at trial; thus, arguing that Mr. Taylor should have been regarded as an unavailable witness.
As noted above, the trial court granted both of the State's motion in limine excluding the use of Mr. Taylor's statement at trial.[29] As it relates to the State's initial motion in limine , on supervisory review, this Court and the Louisiana Supreme Court both upheld the trial court's ruling. Jenkins , 2017-0756, p. 1, writ denied , 2017-1521, 225 So.3d 475. This Court, in particular, did not find that the trial court abused its discretion in granting the State's motion. Id. "The fact that this Court has previously ruled on this issue implicates the law of the case doctrine."
*1188 State v. Zeitoun , 2017-0366, (La. App. 4 Cir. 11/8/17), 231 So.3d 934, 944. This Court, in Zeitoun , noted that:
"The law of the case doctrine requires that, as a general rule, appellate courts refuse to reconsider their own rulings on a subsequent appeal of the same case." Unless the defendant produces new evidence showing that the prior ruling was patently erroneous and produced an unjust result, an appellate court will not reverse its prior rulings. The doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. (internal citations omitted). (emphasis added.)
Id.
In this instant matter, Defendant did not produce any new evidence that evinces this Court's prior ruling was "patently erroneous" or "produced an unjust result" that would warrant a reversal. Thus, this issue is barred on appeal pursuant to the law of the case doctrine.
Consequently, we find these assignments of error lack merit.
Assignment of Error No.2
In Defendant's second assignment of error, he asserts the district court erred in allowing, despite Defendant's objections, the State to continue to question Mr. Bryant regarding threats made to him and/or his family. The State sought to introduce social media posts that Defendant argues were inadmissible evidence of other crimes and hearsay.
As a general matter, "evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial." State v. Trung Le , 2017-0164, p. 19 (La. App. 4 Cir. 4/11/18), 243 So.3d 637, 657 (citing La. C.E. art. 404(B)(1) ; Statev. Prieur , 277 So.2d 126, 128 (La. 1973) ). Accordingly, La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The court record reflects that the State introduced social media posts characterizing Mr. Bryant as a "rat" and a "snitch" and insinuated that he should "kill himself" for testifying against Defendant. Defendant argues that these social media posts were not permissibly introduced for other crimes or bad acts evidence. Instead, Defendant characterizes the State's line of questioning as prejudicial. Contrarily, the State argues it did not improperly illicit prior bad acts evidence and had legitimate reasons to establish Mr. Bryant's non-cooperation at trial. The State also argues that Defendant did not properly preserve this issue for appeal.
We agree that Defendant did not properly preserve this issue for review. At trial, Defendant did not raise an objection based upon inadmissible other crimes evidence or improper character evidence. This Court reasoned, in State v. Griffin , that:
It is well-settled that an irregularity or error, relating to "the ruling or order of the court," cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C.Cr.P. art. 841 *1189 A; State v. Marlowe , [20]10-1116, p. 35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 966. Not only must a contemporaneous objection be made, but also La. C.Cr.P. art. 841 A requires that a defendant make "known to the court ... the grounds therefor," i.e., the grounds for his objection, and he is limited on appeal to the grounds articulated at trial. State v. Ott , [20]10-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287. A new basis for objection cannot be raised for the first time on appeal. (Emphasis added.)
State v. Griffin , 2015-0125, pp. 22-23 (La. App. 4 Cir. 9/16/15), 176 So.3d 561, 574-75.
At trial, the record reflects that Defendant raised several objections, but did not raise any objection on grounds to which he now complains. Thus, Defendant cannot raise this objection for the first time on appeal.
Thus, we find these assignments of error lack merit.
Assignments of Error No. 3 and 4
In Defendant's third and fourth assignments of error, he argues that the district court erred in denying his request that the jury should be instructed on a unanimous verdict and accepting the ten-to-two verdict as legal. Defendant argues the non-unanimous verdict violates the Sixth and Fourteenth Amendment to the United States Constitution and the Louisiana Constitution.
La. Const. Art. 1 § 17 states, in pertinent part, that:
A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict. (Emphasis added).
Here, Defendant was charged with second degree murder, a charge that carries a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, for the shooting that occurred in June 2014. He was convicted of the lesser crime of manslaughter by a ten-to-two jury verdict. This Court acknowledges that since Defendant filed his appellate brief, the La. Const. Art. 1 § 17 has been amended to prohibit non-unanimous verdicts for crimes committed on or after January 1, 2019; however, the Louisiana Supreme Court has not ruled that non-unanimous jury verdicts for crimes committed prior to January 1, 2019 unconstitutional.[30] Generally, Louisiana follows the rule that "a constitutional provision or amendment has prospective *1190 effect only, unless a contrary intention is clearly expressed therein." State v. Cousan , 1994-2503, pp. 17-18 (La. 11/25/96), 684 So.2d 382, 392-393. The crime in this instant matter occurred in June 2014, which was before January 1, 2019. Thus, the district court's jury instructions were appropriate and the ten-to-two jury verdict is a legal verdict.
We find these assignments of error lack merit.
Pro Se Assignment of Error No. 1
In Defendant's pro se appellate brief, he argues that the district court erred in deeming Mr. Bryant's testimony proper.
Defendant argues that despite the fact Mr. Bryant invoked his Fifth Amendment privilege, the district court allowed Mr. Bryant's recorded statement to be played in open court. Defendant argues this action was a violation of his right under the Confrontation Clause of the Sixth Amendment of the United States Constitution. Contrary to this assertion, the court record reflects that the district court sustained Defendant's objection to the recorded statement on grounds it violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. Thus, the court record does not reflect that the district court committed this error.
Thus, we find this assignment of error lacks merit.
CONCLUSION
For the aforementioned reasons, Defendant's conviction and sentence are affirmed.
AFFIRMED

La. R.S. 14:30.1 provides second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.

This Court consolidated the writ applications and granted the State's writ application and denied Mr. Clay's writ application determining that neither Mr. Taylor's nor Mr. Clay's statements should be suppressed. Mr. Clay applied for a writ of certiorari with the Louisiana Supreme Court which upheld the ruling of this Court. State v. Clay , et al . , 2016-0140, p. 1 (La. App. 4 Cir. 4/22/2016), writ denied , 2016-0978 (La. 9/16/16), 206 So.3d 205.

Mr. Clay was sentenced to ten years imprisonment.

In Mr. Taylor's statement, he admitted that Defendant was armed with a gun the night of the shooting and was the individual that rolled down the rear window in the white SUV where the shots were fired; however, Mr. Taylor stated Defendant was not the individual who fired the shots, assigning the other co-defendant, Mr. Clay, as the shooter.

The State filed a second motion in limine to exclude the use of Mr. Taylor's statement in any form because Defendant's counsel alluded to this statement during his opening statement at trial. The trial court granted this motion as well.

La. R.S. 14:31 states, in pertinent part, that "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed."

Detective Vaught testified that surveillance footage was obtained from the following establishments: Club Vaso, Mona's Café, The Maison, Blue Nile, Dat Dog, Louisiana Music Factory, and a residence located at 628 Frenchman Street.

Detective Vaught testified he was able to identify one of the friends as Daniel Bryant. However, Detective Vaught testified he was only able to obtain the nicknames of the other friends: Boy-Boy and DJ.

During the trial, when Detective Vaught testified to this, Defendant objected to this identification as hearsay, which the district court sustained.

Detective Vaught reached out to the Jefferson Parish Sheriff's Office for assistance in obtaining information from its databases.

Detective Vaught presented Mr. Bryant with confirmation photographs of Defendant and Mr. Clay because Mr. Bryant made identification of the two men in a prior interview. However, Mr. Bryant refused to sign the photographs after identification, so Detective Vaught signed each one, but this interview was audio-video recorded and conducted in the presence of Mr. Bryant's attorney.

Ms. Branch informed Detective Vaught that the white SUV was registered to her mother.

Defendant stated that he did not know Donald's last name; however, Detective Vaught was able to identify the cousin as Donald Isom.

During the State's questioning, Mr. Bryant invoked his Fifth Amendment privilege. The district court declined to recognize Mr. Bryant's invocation, reasoning that Mr. Bryant did not have a legal reason to invoke the privilege.

For his failure to testify, the district court held Mr. Bryant in contempt of court, imposing a six (6) month sentence to be served consecutively with his current sentence.

The record reflects that the State noticed its intent to seek supervisory writ application. On appellate review, this Court and the Louisiana Supreme Court denied the State's writ application. State v. Jenkins , 2017-0771 (La.App. 4 Cir. 9/14/17), writ denied , 2017-1553 (La. 9/14/17). Thus, Mr. Bryant's recorded statement was never played in open court; however, the recorded statement was proffered by the State.

Dr. Gardner explained that gun residue usually travels about a maximum six (6) inches away from the muzzle of gun. If residue is recovered on a body, she testified that usually indicates the gun was within that range. She also explained that gun stippling, commonly known as powder burn, occurs when unburned flakes of gunpowder spew out and cause a scrape or abrasion on the surface of the skin. She explained this usually occurs within a distance of two feet from the handgun.

Mr. Bryant stated that Mr. Bryant went by the nickname "Diesel." Social media posts introduced by the State referenced "Diesel," and characterized "Diesel" as a "rat" and a "snitch."

Mr. Butler did not articulate the type of "help" Mr. Bryant was seeking from the State.

Mr. Butler relayed that Mr. Bryant intended to testify hoping that the six (6) month sentence imposed by the district court would be recalled.

Mr. Bryant further expressed that he was uncomfortable testifying the day before.

At the time of the shooting, he only knew Defendant and Mr. Clay.

Mr. Bryant testified, after Detective Vaught printed the photograph, he circled Defendant and Mr. Clay and signed the photograph. At a subsequent interview, Mr. Bryant confirmed the identities of Defendant and Mr. Clay. He identified Defendant as "Shawty." Mr. Bryant stated, while he was willing to participate in the investigation, he did not want his name associated with the case or in any discovery exchanged between parties. He did not explain the reasons behind this request.

Mr. Bryant told Detective Vaught that the weapon was a semi-automatic gun.

Mr. Bryant initially denied refusing to give a statement unless it was off the record. To refresh his recollection, Defendant's counsel played the audio recording of this interview in which he then confirmed this statement was made.

Mr. Bryant he did not provide this information about the shooting incident to the police during the investigation for the instant case.

Ms. Dunn testified that Mr. Dunn was living in Alexandria with his father at the time of the shooting, and on the night of the shooting, he was leaving to return to Alexandria.

In accordance with La. C.Cr. P. art. 920, all appeals are reviewed for errors patent. State v. Anderson , 2008-962, p.2 (La. App. 3 Cir. 2/4/09), 2 So.3d 622, 624.

The State's initial motion in limine was a pre-trial motion that the trial court granted. The State's second motion in limine was filed during trial which the trial court granted as well.

Defendant filed his appellate brief on October 5, 2018. The amendment to La. Const. Art. 1 § 17 prohibiting non-unanimous jury verdicts for capital crimes committed on or after January 1, 2019 became effective on December 12, 2018. However, State v. Ramos , is currently before the Supreme Court of the United States to address whether a state criminal defendant has the right to a unanimous jury verdict pursuant to the Sixth Amendment of the United States Constitution as incorporated through the Fourteenth Amendment of the United States Constitution. State v. Ramos , 2016-1199 (La. App. 4 Cir. 11/2/17), 231 So.3d 44, writ denied , 2017-2133 (La. 6/15/18), 257 So.3d 679, and writ denied sub nom. State ex rel. Evangelisto Ramos v. State , 2017-1177 (La. 10/15/18), 253 So.3d 1300, and cert. granted , No. 18-5924, --- U.S. ----, 139 S.Ct. 1318, --- L.Ed.2d ----, 2019 WL 1231752 (U.S. Mar. 18, 2019).